UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| In re | Chapter 11 |
| ROBERT J. MOCKOVIAK and SANDRA H. MOCKOVIAK, | Case No. 20-14372-MAM |
|     Debtors. | |

_____ /

| | |
|---|---|
| ROBERT J. MOCKOVIAK and SANDRA H. MOCKOVIAK, | Adversary Pro. No. |
|     Plaintiffs, | |
|   v. | |
| LQD BUSINESS FINANCE, LLC, a Delaware Limited Liability Company, LQD LOANS TWO, LLC, a Delaware Limited Liability Company, and GEORGE SOURI, | |
|     Defendants. | |

_____ /

**ROBERT J. MOCKOVIAK AND SANDRA H. MOCKOVIAK'S
COMPLAINT AGAINST LQD BUSINESS FINANCE, LLC,
LQD LOANS TWO, LLC, AND GEORGE SOURI**

Plaintiffs, Robert J. Mockoviak ("**Robert Mockoviak**") and Sandra H. Mockoviak ("**Sandra Mockoviak**," and together with Robert Mockoviak, the "**Mockoviaks**") file this Adversary Complaint against LQD Business Finance, LLC ("**LQD**" and/or "**Hard Money Lender**"), LQD Loans Two, LLC ("**Agent**"), and George Souri ("**Souri**"), and state as follows:

**PRELIMINARY STATEMENT**

1.    The Mockoviaks bring this adversary proceeding against LQD, Agent, and Souri for avoidance and recovery of preferential transfers and equitable subordination of all of LQD and Agent's claims pursuant to Bankruptcy Code Section 510(c).



2.      As part of a lending relationship between LQD and Clinical Professionals, Incorporated a/k/a CPI Global CRO ("**CPI**"), discussed in more detail below, on August 23, 2019, CPI and the Mockoviaks entered into Loan Agreements with LQD.

3.      Souri and the Hard Money Lender crafted and managed the Loan Agreements to ensure that CPI and the Mockoviaks would default quickly and that LQD would own and/or otherwise control CPI and acquire the Mockoviaks' real property, personal property, and assets.  The Loan Agreements, when combined with the Forbearance Agreement, Management Services Agreement, and Stock Pledge Agreement whose execution were fraudulently obtained,  afforded Souri and LQD a clear path to wresting control of CPI from the Mockoviaks.

4.      Specifically, despite the Mockoviaks and CPI's continuous compliance with the terms of the Loan Agreements, LQD fraudulently and maliciously declared the Mockoviaks and CPI to be in default of the Loan Agreements and immediately:

(i)      Exercised Robert Mockoviak's pledged voting shares in CPI, participated on CPI's Board of Directors, appointed Souri as sole Director of CPI, and otherwise assumed absolute control over the management and finances of CPI;

(ii)      Interfered with CPI's business relationships with its clients by: (a) threatening to double charge CPI's clients if they did not deposit their account receivable payments into a lockbox designated by LQD, (b) disclosing the Loan Agreements and personal information (*i.e.*, social security numbers, driver's licenses, salaries, etc.) of the Mockoviaks to CPI's clients in violation of the clients confidentiality requirements,  and (c) threatening to institute litigation if payment was not provided immediately, resulting in CPI's clients refusal to remit payments on account receivables to CPI,  CPI's clients' termination of their contractual agreements with CPI and, ultimately, the financial ruin and destruction of CPI;

(iii)      Forced and/or otherwise compelled the Mockoviaks to "resign" from the management and operation of CPI and prevented them from entering CPI's offices and/or



accessing CPI's books and records and financial documents; and

(iv)    Surreptitiously obtained the entry of a Judgment by Confession against the Mockoviaks and CPI and began levying on the Mockoviaks' real property, personal property, and assets, all the while informing the Mockoviaks and CPI's employees of LQD's intention to cover CPI's payroll and continue operating CPI for the benefit of its shareholders and employees.

5.    Because LQD and Agent's claims arise from the purchase or sale of a security of the debtor, the Mockoviaks seek to subordinate the full amount pursuant to the mandates of 11 U.S.C. § 510(b).

6.    In addition, to the foregoing, the Mockoviaks bring this action to preserve their rights and interests in the face of a purposeful, unlawful, and inequitable scheme perpetrated by Souri and LQD, to acquire CPI and the Mockoviak's real property, personal property, and assets through the mechanism of the Loan Agreements.

7.    The Loan Agreements, Forbearance Agreement, Management Services Agreement, and Stock Pledge Agreement, and LQD and Souri's post-contractual conduct as discussed in detail below, form the basis for a judgment in favor of the Mockoviaks for: (i) avoidance and recovery of preferential transfers pursuant to 11 U.S.C. §§ 547 and 550 [against LQD and Agent]; (ii) equitable subordination of LQD and Agent's claims pursuant to 11 U.S.C. § 510(c) [against LQD and Agent]; (iii) breach of duty of good faith and fair dealing [against LQD and Agent]; (iv) breach of fiduciary duties [against LQD and Agent]; (v) breach of fiduciary duties [against Souri]; (vi) economic duress [against LQD and Agent]; (vii) intentional interference with business relationships [against LQD and Agent]; and (viii) declaratory judgment [against LQD and Agent].

8.    In short, entry of the relief sought herein will have a profound impact on the contours of the contemplated asset sale and recoveries in these proceedings and will fundamentally and rightly alter a *status quo* in which LQD and Agent's claims are presumed to dominate over unsecured claims, wrongly disenfranchising and usurping unsecured



creditors.

## THE PARTIES

9.      Robert Mockoviak is a resident of Palm Beach County, Florida, above eighteen (18) years of age, and otherwise *sui juris*.

10.     Sandra Mockoviak is a resident of Palm Beach County, Florida, above eighteen (18) years of age, and otherwise *sui juris*.

11.     LQD is a Delaware limited liability company, organized and existing under the laws of Delaware.

12.     Agent is a Delaware limited liability company, organized and existing under the laws of Delaware.  Upon information and belief, Agent was not directly involved in the Loan Agreements.

13.     Upon information and belief, Souri is a resident of Lake County, Illinois, above eighteen (18) years of age, and otherwise *sui juris*.  Souri is the CEO of LQD.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(2)(A)and (O) of the Federal Rules of Bankruptcy Procedure, and because this adversary proceeding arises in and is related to the case styled as *In re Robert J. Mockoviak and Sandra H. Mockoviak*, Case No. 20-14372-BKC-MAM currently pending in the United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division.

15.     Venue of this adversary proceeding in this District is proper under 28 U.S.C. §§ 1408 and 1409(a).

16.     All conditions precedent to the bringing of this action have been performed, waived, satisfied, or have occurred.

## PROCEDURAL BACKGROUND

17.     On April 10, 2020, ("**Petition Date**"), the Mockoviaks filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy



Court for the Southern District of Florida, West Palm Beach Division.

18.     To date, no trustee or committee of creditors has been appointed.

## FACTUAL BACKGROUND

**A.     THE MOCKOVIAKS CREATION AND GROWTH OF CPI.**

19.     On December 27, 1999, Robert Mockoviak formed and/or otherwise incorporated CPI in Princeton, New Jersey.  CPI is a full-service contract research organization providing clinical study management services to the pharmaceutical, medical device, and biotechnological industries across a number of therapeutic areas.  CPI provides a wide range of services, including, but not limited to, clinical project management, quality assurance and auditing, regulatory compliance, data management, and medical writing.

20.     Through the concerted efforts of CPI's President, Robert Mockoviak, CPI's Executive Vice President of Business Development, Sandra Mockoviak, and CPI's Chief Operating Officer, Eric Richardson ("**Richardson**"), CPI enjoyed rapid growth.  Over time, CPI secured clinical research/trial agreements with some of the largest pharmaceutical and medical device companies in the world, including Pfizer, Bayer, Medtronic, Smith and Nephew, Zona, Integra, and Canopy, and significantly grew its workforce.

**B.     CHALLENGES TO CPI'S GROWTH.**

21.     While CPI experienced significant growth, it remained one of the smaller clinical research organizations in the United States and was dependent on the timely receipt of payment from its pharmaceutical and medical device clients.  CPI found itself requiring additional financing and capital in 2018 to cover gaps in its cash flow as a result of several issues common to the clinical research industry, including:

(i)     Remittance of payment to CPI anywhere from 60-180 days after the clinical trial and/or work had been completed;

(ii)     Remittance of payment to CPI being "pegged" to certain goals, including, but not limited to, milestone contractual payments, with payment being remitted 45-60 days thereafter;



(iii)    Failure to remit full and/or proper payment of the amounts due to CPI;

(iv)    CPI's inability to obtain prompt responses to their payment delay inquiries; and

(v)    Change in orders, resulting in payment delays of up to 6 months.

At the same time, because its employees were actively managing clinical trials and tracking projects, CPI could not afford to cut certain costs and/or reduce the number of its employees.

**C.    BY 2018 CPI HAS AN IMPLIED VALUATION OF OVER $20 MILLION.**

22.    In an effort to obtain additional capital for CPI, the Mockoviaks turned to Palm Beach Capital to secure funding for CPI.

23.    On or about October 18, 2018, CPI entered into an Amended Operating Agreement with a number of partners from Palm Beach Capital, including, but not limited to, Nathan Ward, Shaun McGruder, and others (collectively, the "**Investors**"), in exchange for an investment in CPI (the "**Amended Operating Agreement**"). *A true and correct copy of the Amended Operating Agreement is attached hereto as **Exhibit A**.* Specifically, under the terms of the Amended Operating Agreement, Robert Mockoviak pledged and/or assigned 15% of his security interest and shares of common stock in CPI to the Investors in exchange for an initial investment of $2,000,000.00 (the "**Initial Investment**") into CPI.

24.    Thereafter, on October 18, 2018, the Investors invested an additional $1,000,000.00 (the "**Subsequent Investment**") into CPI. The Subsequent Investment was contemplated and/or otherwise reflected in the 15% of shares of common stock in CPI furnished to the Investors.

25.    The combined Initial Investment and Subsequent Investment in CPI in exchange for 15% of the shares of common stock in CPI evidences that, as of at least October 18, 2018, the Mockoviaks and the Investors estimated CPI to have a total valuation of approximately $20,000,000.00 (the "**CPI Valuation**").

26.    The Mockoviaks utilized both the Initial Investment and Subsequent Investment to continue CPI's growth initiative. But, because of the above-described



challenges faced in the clinical research industry, particularly the extended 60-180 days cash flow cycles and client change orders that delayed their remittance of payment by up to 6 months, CPI required additional liquidity to cover those extended periods of non-payment.

**D.     CPI'S UNFORTUNATE INTRODUCTION TO LQD.**

27.     As a result of CPI's continuous growth and above-described issues, in 2019, the Mockoviaks turned to Matthew Cohen, President of Noble Funding, LLC ("**Cohen**"), to secure additional financing and/or funding for CPI. Shortly thereafter, Cohen introduced the Mockoviaks to Souri and LQD.

28.     On August 23, 2019, the Mockoviaks and CPI entered into two LQD Business Finance Loan Agreements with LQD: one in the principal amount of $5,250,000.00 and the other in the sum of $1,500,000.00 (collectively, the "**Loan Agreements**"). *True and correct copies of the Loan Agreements are attached hereto as* ***Composite Exhibit B***. The first loan, in the principal sum of $5,250,000.00, was contingent on the total availability of account receivables, while the second loan, in the principal amount of $1,500,000.00, was provided as a term loan.

29.     Further, LQD required that the Mockoviaks execute the Loan Agreements as, at best, an accommodation party. At no time did Robert Mockoviak or Sandra Mockoviak receive anything of value in exchange for their execution of the Loan Agreements.

30.     Immediately before CPI and the Mockoviaks execution of the Loan Agreements, on August 21, 2019, LQD and Agent filed and/or otherwise recorded a UCC Financing Statement with the State of New Jersey, Division of Revenue and Enterprise Services UCC Section against the Mockoviaks and CPI (the "**New Jersey UCC**"). *A true and correct copy of the New Jersey UCC is attached hereto as* ***Exhibit C***. The New Jersey UCC defines the "collateral" covered as "[A]ll of the Debtor's assets and personal property currently owned or later acquired and all proceeds thereof."

31.     To date, CPI and the Mockoviaks have been unable to locate any security agreement executed between the Mockoviaks and CPI, on one hand, and LQD, on the other.



**E.    LQD MANIPULATES THE TERMS OF LOAN AGREEMENTS.**

32.    With full knowledge that the Mockoviaks had ceased negotiations with other financial institutions and lenders and that CPI was dependent on the forthcoming loans, LQD pulled the Loan Agreements immediately before the Mockoviaks' execution of same and changed material terms in the Loan Agreements, including, but not limited to, the appointment of a new Chief Financial Officer for CPI.

33.    Immediately after LQD delivered the modified Loan Agreements to the Mockoviaks, Souri contacted the Mockoviaks and threatened to rescind the loans if they did not return the executed Loan Agreements within three (3) hours. In urgent need of the funds and without any opportunity to review and discuss LQD's last-minute revisions to the Loan Agreements with their attorneys, the Mockoviaks and CPI executed the Loan Agreements.

**F.    THE MOCKOVIAKS AND CPI'S COMPLIANCE WITH LOAN TERMS.**

34.    From the inception of the loans with LQD, CPI and the Mockoviaks complied with the provisions of the Loan Agreements, including, but not limited to, timely remittance of the installment payments required under the Loan Agreements to LQD and submission of any and all required financial statements and documentation for themselves and CPI.

**G.    LQD'S FRAUDULENT ACTIONS IN CONNECTION WITH THE LOAN AGREEMENTS.**

**(I)    LQD'S GRANTING AND UNDERHANDED WITHDRAWAL OF EXEMPTION PERMITTING CLIENTS' DEPOSIT OF THEIR ACCOUNT RECEIVABLE PAYMENTS INTO CPI'S OPERATING ACCOUNT.**

35.    In or about December of 2019, Pfizer - CPI's largest client - expressed concerns to CPI about remitting payment of the amounts due and owing to CPI [approximately $3,400,000.00] to the lockbox account established by LQD under the Loan Agreements. Specifically, Pfizer informed CPI that, because its contractual agreements contained strict confidentiality provisions, the deposit of its account receivable payments into a third-party lockbox could constitute a breach and/or violation of that confidentiality.

36.    Immediately thereafter, Sandra Mockoviak contacted LQD's Account Manager, Tom Greene ("**Greene**"), to inform him that: (i) Pfizer's payments of the account



receivable were forthcoming, (ii) CPI required a quick turnaround on the Pfizer payments, and (iii) CPI would require an exemption from LQD if Pfizer's account receivable payments were indeed deposited into CPI's operating account rather than LQD's designated lockbox so that it could immediately apply the funds towards its outstanding payroll, vendor payments, site payments, and other operational expenses (*i.e.*, as opposed to depositing the funds into LQD's lockbox and awaiting disbursement of same). At that time, Greene confirmed that he would keep an eye out for the Pfizer payments.

37.     Thereafter, Sandra Mockoviak notified Greene that Pfizer had deposited its November 2019 and December 2019 payments [totaling approximately $3,400,000.00] (the "**Pfizer Payments**") into CPI's operating account at Bank of America rather than LQD's designated lockbox. In addition, Sandra Mockoviak reiterated to Greene that CPI required a quick turnaround on the Pfizer Payments in order to pay outstanding payroll, vendor payments, site payments, and other operational expenses.

38.     Greene stated that he understood CPI's situation and agreed that LQD would provide CPI with an exemption.

**(II)     LQD'S SPURIOUS DEFAULT DECLARATION.**

39.     Notwithstanding the parties' agreement, in or about January 2020, Souri - without any reasoning and/or explanation - told the Mockoviaks that they and CPI were in default under the Loan Agreements.

40.     Specifically, Souri told the Mockoviaks that CPI's failure to compel Pfizer to deposit the Pfizer Payments into LQD's designated lockbox constituted an event of default under the Loan Agreements. Further, without any notice to and/or permission from CPI, LQD began directly contacting Pfizer and demanding that it deposit the Pfizer Payment into LQD's lockbox. In fact, the Hard Money Lender even threatened to charge Pfizer twice the amount of the Pfizer Payment unless it immediately deposited the Pfizer Payment into LQD's designated lockbox.

41.     Upon information and belief, at no point during all of this time did LQD



furnish the Mockoviaks and CPI with a written notice of default, declaring the Loan Agreements to be in default as a direct result of the Pfizer Payment being deposited into CPI's operating account.

42.    As a direct and proximate result of LQD's actions, Pfizer refused to continue remitting payment of future account receivables to CPI.

### (III)    THE MOCKOVIAKS' SECURING OF ADDITIONAL FINANCING FOR CPI.

43.    Because of the continuous funding issues and other problems encountered in connection with the Loan Agreements, the Mockoviaks necessitated additional capital to cover CPI's payroll and employee expenses and/or otherwise compensate CPI's employees, remit site and vendor payments, and pay/satisfy some of the operating expenses and costs of CPI.

44.    In January 2020, the Mockoviaks spoke to their consultant about CPI's ability to secure additional third-party financing to fund CPI's payroll and ongoing operational expenses. After communicating with their consultant, on January 6, 2020, CPI entered into an Agreement for the Purchase and Sale of Future Receipts with Global Merchant Cash, Inc. ("**Global Merchant**") in the approximate sum of $500,000.00 (the "**Future Receipts Agreement**"). *A true and correct copy of the Future Receipts Agreement is attached hereto as Exhibit D.*

45.    CPI immediately applied the proceeds of the Futures Receipts Agreement towards the payment of CPI's outstanding payroll and employee expenses, outstanding site payments and vendor payments, and outstanding operational expenses that LQD had refused to fund. CPI was thus able to stay in business.

46.    On January 23, 2020, Souri contacted the Mockoviaks and told them that CPI's execution of the Future Receipts Agreement constituted yet another event of default under the Loan Agreements.



### (IV)    LQDs Malicious Disclosure of the Mockoviaks' Personal Information to CPI's Clients.

47.    On January 23, 2020, the Mockoviaks were shocked to discover that Souri had begun sending email correspondences enclosing copies of the Loan Agreements containing the Mockoviaks' personal information (*i.e.*, residence address, social security numbers, driver's licenses, salaries, etc.) to CPI's clients who, in turn, provided same to CPI's employees. Specifically, because CPI's clients could not understand why such personal confidential information was being disclosed to them, CPI's clients reached out to the employees of CPI to obtain an explanation as to why they were receiving such documentation and information from LQD.

48.    Shortly thereafter, on January 23, 2020, Souri had a conference call with the Mockoviaks, Richardson, Robert Goldstein [Managing Partner of Five G. Capital Partners, LLC] ("**Goldstein**"), and Geno Ruggles [LQD's Account Relationship Manager] ("**Ruggles**") (the "**January 23rd Call**").

49.    During the January 23rd Call, Richardson and CPI's Vice President of Business Development, Justin Wishon ("**Wishon**"), began receiving emails from CPI's clients, including, but not limited to, Pfizer, Medtronic, and Smith and Nephew, informing them that LQD had emailed them copies of the documentation containing the Mockoviaks' personal information and inquiring as to why said information was being disclosed to them.

50.    Upon receipt of the client emails, Richardson immediately informed Sandra Mockoviak and, together, they expressed concern about the disclosure of said personal information to CPI's clients during the January 23rd Call. At that time, Sandra Mockoviak and Richardson informed Souri that because of the ongoing funding issues and other problems encountered in connection with LQD's loans, CPI had been unable to pay its January 15th payroll and did not anticipate being able to cover its January 30th payroll.

51.    During the January 23rd Call, Souri stated that, upon the Mockoviaks and CPI delivery of updated financial statements and information to Hard Money Lender, LQD would cover CPI's payroll and/or otherwise fully compensate CPI's employees.



52.     In addition, during the January 23rd Call, Souri denied that LQD had sent copies of the Loan Agreements to CPI's clients and, after being confronted with the client emails, placed the call on an extended hold and, ultimately, concluded/terminated the call without any explanation.

53.     Unbeknownst to the Mockoviaks, Souri's false denials and requests for updated financial information were laying the groundwork for the litigation and resulting collection efforts that LQD would pursue against the Mockoviaks and CPI only one day later.

54.     Notwithstanding, Souri and Ruggles continued calling and sending FedEx packages and certified letters containing copies of the Loan Agreements to CPI's clients. In addition, the Hard Money Lender continued to harass CPI's clients by threatening to charge them twice the amount of their account receivables if they did not immediately deposit payment into LQD's designated lockbox. When CPI's clients, including Pfizer, refused to remit payment to the lockbox, LQD threatened to institute litigation against them.

(v)     **CPI'S CLIENTS EXPRESS SIGNIFICANT CONCERNS.**

55.     In response to LQD's actions, a number of CPI's clients, including, but not limited to, Pfizer, Medtronics, Zona, and Smith and Nephew, contacted Wishon and Richardson to express their concern over LQD's disclosure of the confidential information contained in the Loan Agreements and inquire as to the reasons for LQD's involvement/meddling into their business relationships with CPI.

56.     Moreover, CPI's clients informed Wishon and Richardson that they were extremely concerned that LQD may have obtained unauthorized access to their contractual agreements with CPI, thereby exposing information to an unknown third-party that for privacy reasons CPI was required to maintain confidential.

57.     Ultimately, the actions undertaken by Souri and LQD: (i) caused CPI's clients to lose confidence in CPI, (ii) led to CPI's clients refusing to remit payment of account receivables to CPI and, (iii) resulted in the termination of their business relationships with CPI.



58.     LQD's actions not only destroyed CPI's business relationships with its existing clients, resulting in CPI's inability to collect on its significant outstanding account receivables, but also ruined and/or otherwise precluded CPI from performing under new contracts it had already entered into and was scheduled to begin in 2020 with new clients, including, but not limited to, Reflexion and Canopy.

**(VI)   LQD's Recordation of the Preferential UCC Financing Statements.**

59.     As further evidence of LQD's malicious actions, on January 27, 2020, LQD filed and/or otherwise recorded a UCC Financing Statement with the Pennsylvania Department of State against the Mockoviaks (the "**Pennsylvania UCC**"). *A true and correct copy of the Pennsylvania UCC is attached hereto as **Exhibit E**.*  While the Pennsylvania UCC defines the "collateral" covered as "[A]ll of the Debtor's assets and personal property currently owned or later acquired and all proceeds thereof," the Pennsylvania UCC did not identify CPI as a "debtor" and is otherwise entirely devoid of any reference to CPI.

60.     In addition, on January 27, 2020, LQD filed and/or otherwise recorded a UCC Financing Statement with the Florida Secured Transaction Registry against the Mockoviaks (the "**Florida UCC**").  *A true and correct copy of the Florida UCC is attached hereto as **Exhibit F**.*  While the Florida UCC defines the "collateral" covered as "[A]ll of the Debtor's assets and personal property currently owned or later acquired and all proceeds thereof," the Florida UCC also did not identify CPI as a "debtor" and is otherwise entirely devoid of any reference to CPI.

**H.     LQD's Misrepresentations and Inequitable Actions.**

**(I)    LQD's Fraudulent Representations to Induce Mockoviaks Into Post-Loan Agreements.**

61.     By the beginning of 2020, LQD's inequitable actions and refusal to provide funding under the Loan Agreements placed CPI on a collision course to disaster.

62.     On February 7, 2020, Souri made a demand on the Mockoviaks.  Specifically, Souri told the Mockoviaks that LQD would refrain or forbear from seeking collection of the



amounts purportedly due under the Loan Agreements and compensate CPI's employees provided - amongst other things - that the Mockoviaks and CPI: (i) executed a forbearance agreement; (ii) executed an agreement appointing an individual of Souri's choosing to be the chief restructuring officer for CPI; and (iii) executed an agreement pledging and/or assigning their security interest and shares of common stock in CPI, together with all voting and income/dividend rights thereunder, to LQD. It was at this time that LQD began manifesting and evidencing its true intentions in connection with CPI and the Mockoviaks.

63.     Later that same day, left with no other alternative, CPI and the Mockoviaks [in their capacities as accommodation parties] entered into a Forbearance and Reaffirmation Agreement with LQD, temporarily forbearing from pursuing collection of the Loan Agreements and requiring CPI and the Mockoviaks to - among other things - execute a: (i) Management Services Agreement; (ii) deposit account control agreement in favor of LQD; and (iii) equity interest pledge agreement in favor of LQD (the "**Forbearance Agreement**"). *A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit G**.*

### (II)     GOLDSTEIN BREAKS INTO CPI'S OFFICES AND MANAGEMENT.

64.     Goldstein is a long-time associate of Souri. Upon information and belief, Goldstein has worked in conjunction with Souri in similar capacities (i.e., advisor, selected chief restructuring officer) on other deals and/or loans funded by LQD.

65.     On February 10, 2020, Goldstein appeared at the building where CPI's offices are located. At the time, Goldstein knew that the Mockoviaks were not present in CPI's offices. Through his misrepresentations, Goldstein gained access to CPI's offices.

66.     Specifically, Goldstein falsely communicated to the building superintendent that he was an employee of CPI, had stepped out of the office to utilize the restroom and, accidentally, locked himself out of CPI's office. Based on Goldstein's fraudulent representations, the superintendent provided him with unfettered access to CPI's office and allowed Goldstein to remain in the office unsupervised for a significant period of time.



67.     Only two days later, on February 12, 2020, CPI entered into a Management Services Agreement with Five G. Capital Partners, LLC ("**Five G**") and its Managing Partner, Goldstein, to serve as the Chief Restructuring Officer of CPI (the "**Management Services Agreement**").  *A true and correct copy of the Management Services Agreement is attached hereto as* ***Exhibit H***.  Immediately thereafter, Souri began exercising control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records.

### (III)    AMENDMENT TO THE LOAN AGREEMENTS.

68.     Having already assumed all elements of control over CPI and as a prelude to its intended takeover of CPI, on February 14, 2020, CPI and the Mockoviaks [in their capacities as accommodation parties] entered into a Loan Amendment with LQD (the "**Amendment**").  *A true and correct copy of the Amendment is attached hereto as* ***Exhibit I***.  In exchange for their execution of the Amendment, Souri agreed that LQD would provide CPI with additional funding in the sum of $750,000.00, meet CPI's payroll and/or compensate its employees, and otherwise move forward with the operation of CPI.

69.     Later that same evening, Goldstein called Sandra Mockoviak while at a "Valentine's Day" dinner at a restaurant and demanded that she and Robert Mockoviak immediately return home, execute a pledge agreement, and return same to LQD that same night.  Souri threatened that if the pledge agreement was not executed within the next few days, CPI and the Mockoviaks would suffer serious consequences.

### (IV)    LQD'S WRONGFUL TAKEOVER OF CPI.

70.     On February 21, 2020, Souri demanded that Robert Mockoviak immediately execute a stock pledge agreement in favor of LQD.  During that communication, Souri informed the Mockoviaks that LQD would only cover CPI's payroll and otherwise compensate CPI's employees for their salaries and earned wages if Robert Mockoviak executed the appropriate pledge agreement.

71.     Shortly thereafter, on February 21, 2020, in reliance on George Souri's



statements and representations and in an effort to protect CPI's employees, Robert Mockoviak executed a Stock Pledge Agreement in favor of LQD, pledging and/or assigning his security interest and shares of common stock in CPI, together with all voting and income/dividend rights thereunder, to LQD (the "**Pledge Agreement**"). *A true and correct copy of the Pledge Agreement is attached hereto as* ***Exhibit J***.

72.     It was only later that Robert Mockoviak discovered that certain terms and provisions in the Pledge Agreement that he and the Mockoviaks' attorneys had negotiated with LQD had been changed without his knowledge and/or consent. As a result, the Pledge Agreement that Robert Mockoviak signed was significantly different from the one that had previously been negotiated and agreed upon.

73.     To the shock and surprise of the Mockoviaks, immediately after Robert Mockoviak's execution of the Pledge Agreement on February 21, 2020, Souri informed the Mockoviaks that LQD had taken over the management and operation of CPI and demanded that the Mockoviaks resign from CPI. Souri refused to allow the Mockoviaks to enter CPI's offices and precluded them from accessing CPI's financial accounts and books and records.

74.     Later that same day, Goldstein resigned as Chief Restructuring Officer for CPI, leaving Souri and LQD in exclusive control of CPI.

75.     On February 29, 2020, Souri, in his capacity as CEO of LQD, executed a Written Consent of the Majority Shareholder of CPI: (i) appointing himself as the sole director of CPI; and (ii) acknowledging LQD's entitlement to vote the shares held by Robert Mockoviak in CPI (the "**Written Consent**"). *A true and correct copy of the Written Consent is attached hereto as* ***Exhibit K***.

76.     In addition, that same day, Souri, in his capacity as Director of CPI, executed a Corporate Action By Consent of the Board of Directors of CPI: (i) removing Richardson as Chief Executive Officer and naming Goldstein as Interim Chief Executive Officer; (ii) adopting the Management Services Agreement; and (iii) naming Richardson as Director of Operations with the caveat that he report directly to Goldstein (the "**Corporate Action by**



**Consent**"). *A true and correct copy of the Corporate Action by Consent is attached hereto as Exhibit L.*

77.     At this point in time, Souri and LQD had completed their fraudulent pre-planned takeover of CPI, leaving LQD fully and exclusively in charge of CPI.

(v)     **LQD's Fraudulent Representations to CPI's Employees.**

78.     On March 9, 2020, in furtherance of his role as Director of CPI, Souri had a conference call with the employees of CPI to discuss the status of CPI (the "**March 9th Call**"). Although the March 9th Call was supposed to include all of the employees of CPI, Souri intentionally excluded a family member of the Mockoviaks [and employee of CPI], so as to prevent that family member from discussing the substance of the March 9th Call with the Mockoviaks.

79.     During the March 9th Call, Souri informed CPI's employees that: (i) he intended to manage and operate CPI going forward; (ii) he was going to compensate the employees for their earned wages and salaries; and (iii) he was in contact with a third-party to secure additional financing to assist LQD with the next steps to be taken so that CPI could continue operating and servicing its clients into the future.

(vi)     **Souri and LQD Try to Abandon CPI Like a Hit-and-Run Driver Fleeing the Scene of the Accident.**

80.     At the inception of the Loan Agreements, CPI had more than sufficient collateral to cover and otherwise repay the proceeds of the Loan Agreements to LQD. But Souri and LQD - through their fraudulent and inequitable actions - managed to destroy CPI within 30 days of their takeover.

81.     The week of March 9th, CPI's remaining clients began terminating their contractual relationships with CPI. Shortly thereafter, on March 13, 2020, Richardson was unconditionally terminated as Director of Operations for CPI. Worse yet, CPI employees and vendors started demanding payment of wages and amounts due.

82.     By March 23, 2020, Souri had apparently realized how badly his actions had



destroyed CPI's value.  Like a hit-and-run driver fleeing the scene of the accident, Souri purported to terminate LQD's "proxy to vote" Robert Mockoviak's shares in CPI, deemed the Pledge Agreement "null, void and of no further effect," and attempted to revert control and operation of the now essentially defunct CPI to the Mockoviaks.

83.     Souri and LQD's shut down was so abrupt and unexpected that many of CPI's employees and clients remained unaware that CPI has ceased operations and closed its doors.  In fact, CPI's employees continue to receive emails from clients and sites in connection with ongoing clinical studies in which CPI was involved even after Souri tried to flee the scene.

84.     As a direct and proximate result of the inequitable and fraudulent activities engaged in by Souri and LQD, the Mockoviaks lost the value of the business that they had built-up over 20 years' time and their sole source of income.  They lost a business that had an implied valuation of $20 million as of October 2018.

I.     **LQD'S CONCEALED LAWSUIT AGAINST THE MOCKOVIAKS AND CPI DURING THE TAKEOVER.**

(I)     **THE CONCEALED LAWSUIT.**

85.     Unbeknownst to the Mockoviaks, and before their and CPI's required execution of the Amendment, Forbearance Agreement, Management Services Agreement, and Pledge Agreement, on January 24, 2020, LQD and Agent filed a Complaint for Confession of Judgment against the Mockoviaks and CPI in the Circuit Court of Cook County, Illinois (the "**Lawsuit**").  The Mockoviaks were not served with process in the Lawsuit and otherwise purposely kept in the dark by LQD and Agent.

86.     On February 7, 2020, in the middle of the forbearance discussions, LQD and Agent obtained a Judgment by Confession in their favor and against the Mockoviaks and CPI in the amount of $6,710,765.00 (the "**Judgment by Confession**").  *A true and correct copy of the Judgment by Confession is attached hereto as **Exhibit M**.*  The Judgment by Confession encompassed damages that could not be ascertained from the Loan Agreements, including future, contingent, unspecified and indeterminate costs and penalties, indemnification



obligations and other fees, and included amounts which should have only been determined based on extrinsic evidence.

87.    On February 19, 2020, LQD and Agent obtained the Circuit Court of Cook County, Illinois' issuance of a Citation to Discover Assets to a Third-Party directed to: (i) Bank of America, N.A., (ii) Synovus Bank, (iii) TD Ameritrade, Inc., and (iv) TD Bank, N.A., requiring that each financial institution provide responses to interrogatories and produce documentation related to CPI and the Mockoviaks (collectively, the "**Citations to Discover Assets**"). *True and correct copies of the Citations to Discover Assets are attached hereto as Exhibit N.* Shortly thereafter, LQD and Agent served garnishment documents on Bank of America, resulting in the freezing of CPI's operating account and the Mockoviaks' personal account(s).

88.    It was not until February 21, 2020, after receiving certain Third-Party Citation Notices from the Circuit Court of Cook County, Illinois, that the Mockoviaks first learned about the Lawsuit.  Upon learning of the Lawsuit, the Mockoviaks took immediate action, including obtaining a copy of the court file and retaining local counsel in Illinois to represent their interests in the Lawsuit.

### (II)    IMMEDIATE ACTIONS UNDERTAKEN BY THE MOCKOVIAKS TO ADDRESS THE CONCEALED LAWSUIT.

89.    On March 9, 2020, the Mockoviaks and CPI filed a Motion to Reopen and Vacate February 7, 2020 Judgment, with supporting Affidavits (the "**Motion to Vacate**"), and Motion to Quash and Dismiss, or in the Alternative Stay, Citations to Discover Assets (the "**Motion to Quash**"). *True and correct copies of the Motion to Vacate and Motion to Quash are attached hereto as Composite Exhibit O.*

90.    On March 10, 2020, the Circuit Court of Cook County, Illinois conducted a hearing on the Motion to Quash and, thereafter, entered an Order: (i) extending and continuing the Citations to Discover Assets until May 11, 2020; and (ii) requiring that all accounts and sums applicable to the Citations to Discover Assets continue to be held until further order of the court (the "**Order on Motion to Quash**").  *A true and correct copy of the*



*Order on Motion to Quash is attached hereto as **Exhibit P**.*

91.     The Circuit Court of Cook County, Illinois scheduled a hearing on the Motion to Vacate for March 19, 2020.  But, due to the Coronavirus pandemic, the hearing was canceled and has yet to be rescheduled by the Court.

92.     As a result, while the proceedings are tolled, the Mockoviaks' personal bank accounts remain frozen and they are unable to access any funds to pay their day-to-day expenses.

## CAUSES OF ACTION

### COUNT I – AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 547 AND 550
### (AGAINST LQD AND AGENT)

93.     The Mockoviaks readopt and reallege paragraphs 1-92 of this Adversary Complaint as if set forth fully herein.

94.     This is an action by the Mockoviaks against LQD and Agent to avoid and recover preferential transfers made to or for their benefit pursuant to 11 U.S.C. §§ 547 and 550 of the Bankruptcy Code.

95.     During the ninety (90) days prior to the Petition Date, LQD and Agent received one or more transfers, including, but not necessarily limited to: (i) Florida UCC; (ii) Pennsylvania UCC; (iii) Forbearance Agreement; (iv) Amendment; (v) Pledge Agreement; and (vi) Judgment by Confession (collectively, the "**90 Day Transfers**"), on account of an antecedent debt.

96.     The 90 Day Transfers at issue may be avoided by the Mockoviaks because they constituted transfers of the Mockoviaks' interest in real property, personal property, and assets.

97.     The 90 Day Transfers were made:

(i)     To or for the benefit of LQD and Agent, who, at all relevant times, were creditors of the Mockoviaks who made the particular 90 Day Transfers;



(ii)     For or on account of an antecedent debt purportedly owed by the Mockoviaks to LQD and Agent before such 90 Day Transfers were made;

(iii)    While the Mockoviaks were insolvent; and

(iv)    On or within 90 days of the Petition Date.

98.     The 90 Day Transfers to LQD and Agent enabled them to receive more than they would have received if:

(i)     This case was a case under Chapter 11 of the Bankruptcy Code;

(ii)     The 90 Day Transfers had not been made; and

(iii)    LQD and Agent received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

99.     By reason of the foregoing, the 90 Day Transfers are avoidable by the Mockoviaks pursuant to 11 U.S.C. § 547 of the Bankruptcy Code.

100.    The Mockoviaks are entitled to recover the amount or value of the 90 Day Transfers from LQD and Agent pursuant to 11 U.S.C. § 550 of the Bankruptcy Code.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against LQD and Agent:

(i)     Avoiding the 90 Day Transfers to LQD and Agent pursuant to 11 U.S.C. § 547 of the Bankruptcy Code;

(ii)     Awarding a money judgment in favor of the Mockoviaks and against LQD and Agent in an amount no less than the 90 Day Transfers pursuant to 11 U.S.C. § 550 of the Bankruptcy Code, plus prejudgment interest;

(iii)    Disallowing any claim that LQD and Agent may have against the Mockoviaks' bankruptcy estates until such time as LQD and Agent pay the 90 Day Transfers asserted herein as provided in to 11 U.S.C. § 502 of the Bankruptcy Code;

(iv)    Awarding costs and expenses of this action, including, without limitation,



attorneys' fees; and

(v)     Granting such other and further relief as the Court deems just and equitable.

### COUNT II – EQUITABLE SUBORDINATION OF LQD'S CLAIMS PURSUANT TO 11 U.S.C. § 510(C)
### (AGAINST LQD AND AGENT)

101.    The Mockoviaks readopt and reallege paragraphs 1-92 of this Adversary Complaint as if set forth fully herein.

102.    LQD and Agent's claims in this case arise wholly from LQD's inequitable conduct as described herein and should be subordinated to the claims of other creditors and equity holders of the Mockoviaks.

103.    Moreover, LQD's conduct caused injury to the Mockoviaks' other creditors and conferred an unfair advantage on LQD and Agent.

104.    Under principles of equitable subordination, all claims asserted against the Mockoviaks by, on behalf of or for the benefit of LQD and Agent should be subordinated for purposes of distribution pursuant to 11 U.S.C. §§ 501(c) and 105(a) of the Bankruptcy Code.

105.    During its negotiations with CPI and the Mockoviaks over the Loan Agreements, LQD fraudulently misrepresented that its desire in entering into the Loan Agreements was to provide financing for CPI so that CPI could successfully operate its business, meet the needs of its clients, and compensate its employees. The Hard Money Lender presented misleading information that caused the Mockoviaks and CPI to believe that LQD's financing plan would allow the Mockoviaks to operate CPI and continue its growth.

106.    These representations were false and known by LQD to be false when made, as LQD and Agent intended at all times to induce the Mockoviaks and CPI into entering into the Loan Agreements, then act in bad faith so that they could declare CPI and the Mockoviaks to be in default, accelerate the loan balance, take over the management and operation of CPI for its own benefit, and pursue collection of the Mockoviaks' real property,



personal property, and assets.  All the while, LQD continually assured the Mockoviaks that its intention was for CPI to succeed in operating its business when in fact, the opposite was true.

107.    In fact, in direct contravention and contumacious disregard of its representations and statements, LQD:

(i)    Without any notice to and/or permission from CPI, directly contacted CPI's clients, demanded that those clients deposit their payments into LQD's designated lockbox, threatened to charge those clients twice the amount of their account receivables if payment was not immediately remitted to said lockbox, and otherwise threatened to institute litigation against CPI's clients;

(ii)    Refused to properly fund the Loan Agreements and otherwise precluded the Mockoviaks and CPI from paying CPI's employees their earned wages and salaries and/or disbursing any funds until such time as CPI's clients deposited their account receivable payments into LQD's designated lockbox;

(iii)    Sent correspondence to CPI's employees and clients enclosing copies of the Loan Agreements and the Mockoviak's personal information (*i.e.*, residence address, social security numbers, salary, etc.) and demanding that they deal directly with and otherwise remit all future payments directly to LQD, causing CPI's clients to believe that CPI was incapable of maintaining information confidential as required under HIPAA requirements/guidelines and resulting in said clients' refusal to remit outstanding payments to CPI;

(iv)    Agreed that, in exchange for the Mockoviaks' execution of the Forbearance Agreement and accompanying documents (*i.e.*, Management Services Agreement and Pledge Agreement), it would cover CPI's payroll and/or otherwise pay CPI's employees their salaries and/or earned wages;

(v)    Changed and/or modified certain terms and provisions of the Pledge Agreement without the Mockoviaks' knowledge or consent, resulting in Robert Mockoviak's

23



execution of a pledge agreement with significantly different terms than had been previously negotiated with LQD;

(vi)    Exercised dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records and demanding that the Mockoviaks "resign" from their involvement in CPI; and

(vii)    Rescinded the Pledge Agreement and relinquished control and management over CPI to the Mockoviaks after destroying and/or otherwise running CPI into the ground.

108.    At all times, the Hard Money Lender knew its intentions were inequitable and conduct was fraudulent yet induced the Mockoviaks and CPI to enter into the Loan Agreements under the guise that it wanted CPI to succeed when at all times, LQD planned for CPI to fail so that it could seize control over CPI and acquire the real property, personal property, and assets of the Mockoviaks. The Mockoviaks detrimentally and justifiably relied on these fraudulent misrepresentations in deciding to enter into the Loan Agreements.

109.    As a direct and proximate result of LQD's fraudulent and inequitable conduct, the Mockoviaks have suffered severe damages, including: (i) the destruction of CPI, loss of existing clients and prospective client contracts, and loss of their sole source of income; (ii) the loss of real property, personal property, and assets resulting from the entry of a Judgment by Confession in the Lawsuit and subsequent levy/execution proceedings commenced against the Mockoviaks; and (iii) claims and lawsuits being instituted against the Mockoviaks arising from LQD's failure and/or refusal to compensate CPI's employees and furnish CPI's clients with the clinical services required under their respective agreements.

110.    The Hard Money Lender's conduct as set forth above was undertaken with no regard to the impact that such conduct would have on other creditors of the Mockoviaks. LQD's inequitable actions have injured other creditors because funds that would have been derived from the purchase and/or sale of the Mockoviaks' personal property and assets and paid to those creditors were diverted to LQD and Agent in connection with the Loan



Agreements. Those creditors did nothing to contribute to the risk of non-payment or the onerous terms of the Loan Agreements, Forbearance Agreement, Amendment, and Stock Pledge Agreement, and should not be punished by LQD's misconduct.

111.    Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

WHEREFORE, the Mockoviaks respectfully request that:

(i)     Judgment be entered against LQD and Agent ordering that their claims against the Mockoviaks be equitably subordinated to the claims of other creditors or denied due to LQD's inequitable conduct and bad faith in negotiating, administering and pursuing collection of the Loan Agreements against the Mockoviaks;

(ii)    Requiring the transfer and/or return of any personal property or assets of the Mockoviaks received by LQD and Agent on account of the Loan Agreements;

(iii)   Requiring the disgorgement of all payments and consideration received by LQD and Agent on account of the Loan Agreements; and

(iv)    Granting such other and further relief as the Court deems just and equitable.

### COUNT III – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### (AGAINST LQD AND AGENT)

112.    The Mockoviaks readopt and reallege paragraphs 1-92 of this Adversary Complaint as if set forth fully herein.

113.    The Hard Money Lender owed a duty to the Mockoviaks to properly perform its obligations under the Loan Agreements and Forbearance Agreement with good faith and fair dealing and LQD failed to perform its duties and obligations in accordance therewith.

114.    Specifically, the Hard Money Lender breached that duty by:

(i)     Without any notice to and/or permission from CPI, directly contacting CPI's clients, demanding that those clients deposit their payments into LQD's designated lockbox, threatening to charge those clients twice the amount of their account receivables if payment



was not immediately remitted to said lockbox, and otherwise threatening to institute litigation against CPI's clients;

(ii)     Refusing to properly fund the Loan Agreements and otherwise precluded the Mockoviaks and CPI from paying CPI's employees their earned wages and salaries and/or disbursing any funds until such time as CPI's clients deposited their account receivable payments into LQD's designated lockbox;

(iii)     Sending correspondence to CPI's employees and clients enclosing copies of the Loan Agreements and the Mockoviak's personal information (*i.e.*, residence address, social security numbers, salary, etc.) and demanding that they deal directly with and otherwise remit all future payments directly to LQD, causing CPI's clients to believe that CPI was incapable of maintaining information confidential as required under HIPAA requirements/guidelines and resulting in said clients' refusal to remit outstanding payments to CPI;

(iv)     Agreeing that, in exchange for the Mockoviaks' execution of the Forbearance Agreement and accompanying documents (*i.e.*, Management Services Agreement and Pledge Agreement), it would cover CPI's payroll and/or otherwise pay CPI's employees their salaries and/or earned wages;

(v)     Changing and/or modifying certain terms and provisions of the Pledge Agreement without the Mockoviaks' knowledge or consent, resulting in Robert Mockoviak's execution of a pledge agreement with significantly different terms than had been previously negotiated with LQD;

(vi)     Exercising dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records and demanding that the Mockoviaks "resign" from their involvement in CPI; and

(vii)     Rescinding the Pledge Agreement and relinquishing control and management over CPI to the Mockoviaks after destroying and/or otherwise running CPI into the ground.



115.    LQD's breaches of its duty of good faith and fair dealing were conscious and deliberate acts and unfairly frustrated the agreed common purpose of the Loan Agreements and Forbearance Agreement.

116.    LQD's breaches of its duty of good faith and fair dealing frustrated and disappointed the reasonable expectations of the Mockoviaks, thereby depriving the Mockoviaks of the benefits of the Loan Agreements and Forbearance Agreement, and, ultimately, decimating and financially ruining CPI.

117.    As a direct and proximate cause of LQD's breaches of its duty of good faith and fair dealing, the Mockoviaks have suffered substantial direct and consequential damages.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against LQD and Agent for the direct and consequential damages they have suffered, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### COUNT IV – BREACH OF FIDUCIARY DUTIES
### (LQD AND AGENT)

118.    The Mockoviaks readopt and reallege paragraphs 1-92 of this Adversary Complaint as if set forth fully herein.

119.    By virtue of its exercise of dominion and control over the management and operation of CPI, LQD owed a fiduciary duty to deal with the Mockoviaks in the best interest of CPI and in a manner consistent with honesty, fairness, and good faith.  In particular, LQD owed a fiduciary duty to not engage in any act of self-dealing for its own benefit or to the detriment of CPI and its shareholders, including the Mockoviaks.

120.    The Hard Money Lender breached its fiduciary duties to the Mockoviaks by crafting and managing the Loan Agreements and Forbearance Agreement in such a way as to ensure that CPI would default quickly and that LQD would own and/or otherwise control CPI and acquire the real property, personal property, and assets of the Mockoviaks.

121.    Specifically, LQD's breached its duty by:



(i)     Without any notice to and/or permission from CPI, directly contacting CPI's clients, demanding that those clients deposit their payments into LQD's designated lockbox, threatening to charge those clients twice the amount of their account receivables if payment was not immediately remitted to said lockbox, and otherwise threatening to institute litigation against CPI's clients;

(ii)    Refusing to properly fund the Loan Agreements and otherwise precluding the Mockoviaks and CPI from paying CPI's employees their earned wages and salaries and/or disbursing any funds until such time as CPI's clients deposited their account receivable payments into LQD's designated lockbox;

(iii)   Sending correspondence to CPI's employees and clients enclosing copies of the Loan Agreements and the Mockoviak's personal information (*i.e.*, residence address, social security numbers, salary, etc.) and demanding that they deal directly with and otherwise remit all future payments directly to LQD, causing CPI's clients to believe that CPI was incapable of maintaining information confidential as required under HIPAA requirements/guidelines and resulting in said clients' refusal to remit outstanding payments to CPI;

(iv)    Agreeing that, in exchange for the Mockoviaks' execution of the Forbearance Agreement and accompanying documents (*i.e.*, Management Services Agreement and Pledge Agreement), it would cover CPI's payroll and/or otherwise pay CPI's employees their salaries and/or earned wages;

(v)     Changing and/or modifying certain terms and provisions of the Pledge Agreement without the Mockoviaks' knowledge or consent, resulting in Robert Mockoviak's execution  of a pledge agreement with significantly different terms than had been previously negotiated with LQD;

(vi)    Exercising dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records and demanding that the Mockoviaks "resign" from



their involvement in CPI; and

(vii)    Rescinding the Pledge Agreement and relinquishing control and management over CPI to the Mockoviaks after destroying and/or otherwise running CPI into the ground.

122.    As a direct and proximate result of LQD's breaches of fiduciary duties, the Mockoviaks have been divested of any and all interest that they had in CPI and have suffered and continue to suffer monetary damages for which the Hard Money Lender and Agent are liable.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against LQD and Agent for damages they have suffered, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### COUNT V – BREACH OF FIDUCIARY DUTIES
### (SOURI)

123.    The Mockoviaks readopt and reallege paragraphs 1-92 of this Adversary Complaint as if set forth fully herein.

124.    By virtue of his involvement as a sole Director of CPI, Souri owed a fiduciary duty to deal with the Mockoviaks in the best interest of CPI and in a manner consistent with honesty, fairness, and good faith.  In particular, in his capacity as sole Director of CPI, Souri owed a fiduciary duty to not engage in any act of self-dealing for his own benefit and/or the benefit of his company, LQD, or to the detriment of CPI and its shareholders, including the Mockoviaks.

125.    Souri breached his fiduciary duties to the Mockoviaks by crafting and managing the Loan Agreements and Forbearance Agreement in such a way as to ensure that CPI would default quickly and that he and LQD would own and/or otherwise control CPI and acquire the real property, personal property, and assets of the Mockoviaks.

126.    Specifically, Souri breached his duty by:

(i)    Without any notice to and/or permission from CPI, directly contacting CPI's clients, demanding that those clients deposit their payments into LQD's designated lockbox,



threatening to charge those clients twice the amount of their account receivables if payment was not immediately remitted to said lockbox, and otherwise threatening to institute litigation against CPI's clients;

(ii)     Refusing to have LQD properly fund the Loan Agreements and otherwise precluding the Mockoviaks and CPI from paying CPI's employees their earned wages and salaries and/or disbursing any funds until such time as CPI's clients deposited their account receivable payments into LQD's designated lockbox;

(iii)    Sending correspondence to CPI's employees and clients enclosing copies of the Loan Agreements and the Mockoviak's personal information (*i.e.*, residence address, social security numbers, salary, etc.) and demanding that they deal directly with and otherwise remit all future payments directly to LQD, causing CPI's clients to believe that CPI was incapable of maintaining information confidential as required under HIPAA requirements/guidelines and resulting in said clients' refusal to remit outstanding payments to CPI;

(iv)     Agreeing that, in exchange for the Mockoviaks' execution of the Forbearance Agreement and accompanying documents (*i.e.*, Management Services Agreement and Pledge Agreement), LQD would cover CPI's payroll and/or otherwise pay CPI's employees their salaries and/or earned wages;

(v)      Changing and/or modifying certain terms and provisions of the Pledge Agreement without the Mockoviaks' knowledge or consent, resulting in Robert Mockoviak's execution of a pledge agreement with significantly different terms than had been previously negotiated with him and LQD;

(vi)     Exercising dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records and demanding that the Mockoviaks "resign" from their involvement in CPI; and

(vii)    Rescinding the Pledge Agreement and Written Consent and purportedly



resigning as sole Director of CPI after destroying and/or otherwise running CPI into the ground.

127.    As a direct and proximate result of Souri's breaches of fiduciary duties, the Mockoviaks have been divested of any and all interest that they had in CPI and have suffered and continue to suffer monetary damages for which Souri is liable as sole Director of CPI.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against Souri  for damages they have suffered, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### COUNT VI – ECONOMIC DURESS
#### (AGAINST LQD AND AGENT)

128.    The Mockoviaks readopt and reallege paragraphs 1-92 of this Adversary Complaint as if set forth fully herein.

129.    The Mockoviaks executed the Loan Agreements under economic duress as LQD threatened to rescind the loans if the CPI and the Mockoviaks [in their capacities as accommodation parties] did not execute and return the Loan Agreements within three (3) hours.

130.    At the time, the Hard Money Lender knew that the Mockoviaks had discontinued negotiations with other financial institutions, were reliant on LQD's funding, and otherwise had no other option but to sign the Loan Agreements.  LQD was fully aware that Mockoviaks were significantly invested in CPI and risked losing CPI's contractual agreements with its clients [due to an inability to fund its  clinical services] and its employees [due to an inability to pay and/or compensate them] if it refused to finance the Loan Agreements.

131.    In addition, the Hard Money Lender was fully aware that the Mockoviaks were under extreme economic duress when it demanded that they execute the Forbearance Agreement, Amendment, and Pledge Agreement.  In fact, LQD threatened to rescind the Forbearance Agreement and not fund CPI's payroll if the Mockoviaks did not immediately execute and return both documents, without affording the Mockoviaks any time to review

31



and/or otherwise discuss the contents of the Pledge Agreement with their attorneys.

132.    LQD knew that the Mockoviaks had no option but to sign the Forbearance Agreement, Amendment, and Pledge Agreement as they and CPI were under threat of: (i) default, acceleration, and collection of the Loan Agreements, (ii) breach of CPI's contractual agreements with its clients and employees and (iii) the destruction of CPI, loss of the Mockoviaks' sole source of income, and loss of their real property, personal property, and assets.

133.    As a direct and proximate result of LQD's actions in connection with the Loan Agreements, Forbearance Agreement, Amendment, and Pledge Agreement, the Mockoviaks have suffered and continue to suffer significant damages.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against LQD and Agent for compensatory damages, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### COUNT VII – INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS
#### (AGAINST LQD AND AGENT)

134.    The Mockoviaks readopt and reallege paragraphs 1-92 of this Adversary Complaint as if set forth fully herein.

135.    LQD had knowledge of CPI's existing contractual agreements with its clients, including, but not limited to, Pfizer, Medtronic, Zona, and Smith and Nephew, and the clients' obligations thereunder, including, but not limited to, their obligations to remit payment on the outstanding account receivables to CPI.

136.    LQD intentionally interfered with the contractual agreements by inducing the clients to breach their contractual agreements.

137.    LQD's interference with the contractual agreements, particularly its refusal to allow payments to be deposited into CPI's operating account and threats of billing/charging CPI's clients twice the amount of their accounts receivable and/or resorting to litigation, is without justification or privilege.  LQD had no prior economic interest in the



transaction.  The Hard Money Lender merely had a prospective interest in getting CPI's business and making the loan.

138.    The Mockoviaks and CPI have been damaged by LQD's interference with CPI's contractual agreements with the clients.  The Hard Money Lender's actions resulted in CPI's clients withholding payment to CPI on its account receivables which constrained and, ultimately, decimated and destroyed CPI.  These monies were due to CPI and LQD should have facilitated the monies being paid to CPI.

139.    The Mockoviaks and CPI have been damaged by LQD's interference with the contractual agreements, including but not limited to, lost income, business, and goodwill.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against LQD and Agent for damages and special damages, including, without limitation, all actual losses suffered by the Mockoviaks as a result thereof and all unjust enrichment flowing to LQD and Agent from the Hard Money Lender's interference with CPI's contractual agreements with its clients, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

## COUNT VIII – DECLARATORY JUDGMENT
### (AGAINST LQD AND AGENT)

140.    The Mockoviaks readopt and reallege paragraphs 1-92 of this Adversary Complaint as if set forth fully herein.

141.    This is an action for declaratory judgment and relief against LQD and Agent under Rule 57 of the Federal Rules of Civil Procedure.  Pursuant to 28 U.S.C. § 2201(a), this Court has jurisdiction to declare the rights and other legal relations being sought by the Mockoviaks.

142.    The Mockoviaks bring this cause of action against LQD and Agent seeking a declaration that: (i) at the time of LQD's wrongful takeover of the management and operation of CPI, CPI had sufficient collateral and account receivables to pay back the Loan Agreements; and (ii) LQD's exercise of dominion and control over the management and operation of CPI and CPI's assets and account receivables constituted an acceptance of the



collateral in full and final satisfaction of the Mockoviaks and CPI's obligations under the Loan Agreement and/or the Mockoviaks are entitled to a credit for the full amount of CPI's collateral and account receivables against any amounts claimed by LQD and Agent against the Mockoviaks.

143.    At the time that CPI and the Mockoviaks [in their capacities as accommodation parties] entered into the Loan Agreements with LQD, CPI had an implied valuation of approximately $20,000,000.00 (*i.e.*, the CPI Valuation).

144.    The Loan Agreements, coupled with the additional amounts furnished to CPI and the Mockoviaks under the Amendment, at the time had an approximate value of $7,500,000.00.  As such, CPI had more than sufficient collateral and account receivables to pay back the amounts received under the Loan Agreements and Amendment.

145.    In addition, through the efforts of the Mockoviaks, CPI had secured contractual agreements with new clients, including, but not limited to, Bayer, Reflexion and Canopy, that were scheduled to begin in 2020 and promised to bring significant revenue to CPI.

146.    As a direct and proximate result of LQD's exercise of dominion and control over the management and operation of CPI and other fraudulent and inequitable conduct perpetrated by LQD and its CEO, Souri [as more fully delineated above], CPI's clients lost confidence in CPI resulting in: (i) CPI's clients refusal to remit payment of account receivables to CPI; (ii) termination of CPI's existing business relationships with its clients; and (iii) CPI's inability to perform under and loss of the new contractual agreements for 2020.

147.    LQD's exercise of dominion and control over the management and operation of CPI and CPI's assets, account receivables, etc., constituted an acceptance of the collateral in full and final satisfaction of the Mockoviaks and CPI's obligations under the Loan Agreement.  As a result of LQD's failure to use reasonable care in the custody and preservation of the collateral, the loan collateral suffered a significant diminution in value



and CPI was destroyed.

148.     Given that the Hard Money Lender's actions resulted in a significant diminution in value of the loan collateral, loss of revenue to CPI and, ultimately, the destruction of CPI [causing the Mockoviaks significant losses as both employees and shareholders of CPI], the Mockoviaks are entitled to a credit for the full amount of CPI's collateral and account receivables as against any amounts claimed by LQD and Agent against the Mockoviaks.

149.     As shareholders and officers of CPI, the Mockoviaks have a real, tangible, and protectible interest in the assets and account receivables of CPI, especially since LQD and Agent are seeking to hold them liable for the entire outstanding amounts purportedly due and owing to them under the Loan Agreements.

150.     The judicial declaration sought by the Mockoviaks concerns a controversy as to a present, ascertained or ascertainable state of facts.  Furthermore, LQD and Agent have an actual, present, adverse, and antagonistic interest in the subject matter of the declaratory relief sought by the Mockoviaks.

151.     As a consequence of LQD and Agent's actions and claims, the Mockoviaks are in doubt as to the existence or non-existence of their right to have LQD's exercise of dominion and control over the management and operation of CPI and CPI's assets, account receivables, etc., deemed an acceptance of the collateral in full and final satisfaction of the Mockoviaks and CPI's obligations under the Loan Agreement and/or their right to a credit for the full amount of CPI's collateral and account receivables as against any amounts claimed by LQD and Agent against the Mockoviaks.

152.     Pursuant to Rule 57 of the Federal Rules of Civil Procedure, the Mockoviaks are entitled to have such doubt removed.

WHEREFORE, the Mockoviaks respectfully request the entry of a declaratory judgment in their favor and against LQD and Agent:

    (i)     Determining that, at the time of LQD's wrongful takeover of the management



and operation of CPI, CPI had sufficient collateral and account receivables to pay back the Loan Agreements;

(ii)     Deeming that LQD's exercise of dominion and control over the management and operation of CPI and CPI's assets and account receivables constituted an acceptance of the collateral in full and final satisfaction of the Mockoviaks and CPI's obligations under the Loan Agreement and/or otherwise providing the Mockoviaks with a credit for the full amount of CPI's collateral and account receivables against any amounts claimed by LQD and Agent against the Mockoviaks; and

(iii)    Granting such other and further relief as the Court deems just and equitable.

Dated:  April 22, 2020              Respectfully submitted,

**SALAZAR LAW**
*Counsel for Robert J. Mockoviak*
*and Sandra H. Mockoviak*
2000 Ponce de Leon Boulevard, Penthouse
Coral Gables, Florida  33134
Telephone: (305) 374-4848
Facsimile:  (305) 397-1021
Primary Email:  Luis@Salazar.Law
Primary Email:  Ceide@Salazar.Law
Secondary Email:  Lee-Sin@Salazar.Law
Secondary Email:  eService@Salazar.Law


By:____/s/____Luis Salazar_____
          Luis Salazar
          Florida Bar No. 147788
          Jose Ceide
          Florida Bar No. 015937

