UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| In re | Chapter 11 |
| ROBERT J. MOCKOVIAK and SANDRA H. MOCKOVIAK, | Case No. 20-14372-MAM |
| Debtors. | |
| _____ / | |
| ROBERT J. MOCKOVIAK and SANDRA H. MOCKOVIAK, | Adversary Pro. No.  20-01142-MAM |
| Plaintiffs,<br>v. | |
| LQD BUSINESS FINANCE, LLC, a Delaware Limited Liability Company, LQD LOANS TWO, LLC,  a Delaware Limited Liability Company, and GEORGE SOURI, Individually, | |
| Defendants. | |
| _____ / | |

**ROBERT J. MOCKOVIAK AND SANDRA H. MOCKOVIAK'S AMENDED
COMPLAINT AGAINST LQD BUSINESS FINANCE, LLC,
LQD LOANS TWO, LLC, AND GEORGE SOURI**

Plaintiffs, Robert J. Mockoviak ("**Robert Mockoviak**") and Sandra H. Mockoviak ("**Sandra Mockoviak**," and together with Robert Mockoviak, the "**Mockoviaks**") file this Amended Adversary Complaint against LQD Business Finance, LLC ("**LQD**" and/or "**Hard Money Lender**"), LQD Loans Two, LLC ("**Agent**"), and George Souri ("**Souri**"), and state as follows:

**PRELIMINARY STATEMENT**

1.      The Mockoviaks bring this adversary proceeding against LQD, Agent, and Souri for avoidance and recovery of preferential transfers and equitable subordination of all

of LQD and Agent's claims pursuant to Bankruptcy Code Section 510(c).

2.      As part of a lending relationship between LQD and Clinical Professionals, Incorporated a/k/a CPI Global CRO ("**CPI**"), discussed in more detail below, on August 23, 2019, CPI and the Mockoviaks entered into Loan Agreements with LQD.

3.      Souri and the Hard Money Lender crafted and managed the Loan Agreements to ensure that CPI and the Mockoviaks would default quickly and that LQD would own and/or otherwise control CPI and acquire the Mockoviaks' real property, personal property, and assets.  The Loan Agreements, when combined with the Forbearance Agreement, Management Services Agreement, and Stock Pledge Agreement whose execution were fraudulently obtained,  afforded Souri and LQD a clear path to wresting control of CPI from the Mockoviaks.

4.      Specifically, despite the Mockoviaks and CPI's continuous compliance with the terms of the Loan Agreements, LQD fraudulently and maliciously declared the Mockoviaks and CPI to be in default of the Loan Agreements and immediately:

(i)      Exercised Robert Mockoviak's pledged voting shares in CPI, participated on CPI's Board of Directors, appointed Souri as sole Director of CPI, and otherwise assumed absolute control over the management and finances of CPI;

(ii)      Interfered with CPI's business relationships with its clients by: (a) threatening to double charge CPI's clients if they did not deposit their account receivable payments into a lockbox designated by LQD, (b) disclosing the Loan Agreements and personal information (*i.e.*, social security numbers, driver's licenses, salaries, etc.) of the Mockoviaks to CPI's clients in violation of the clients confidentiality requirements,  and (c) threatening to institute litigation if payment was not provided immediately, resulting in CPI's clients refusal to remit payments on account receivables to CPI,  CPI's clients' termination of their contractual agreements with CPI and, ultimately, the financial ruin and destruction of CPI;



(iii)    Forced and/or otherwise compelled the Mockoviaks to "resign" from the management and operation of CPI and prevented them from entering CPI's offices and/or accessing CPI's books and records and financial documents; and

(iv)    Surreptitiously obtained the entry of a Judgment by Confession against the Mockoviaks and CPI and began levying on the Mockoviaks' real property, personal property, and assets, all the while informing the Mockoviaks and CPI's employees of LQD's intention to cover CPI's payroll and continue operating CPI for the benefit of its employees and shareholders.

5.    Because LQD and Agent's claims arise from the purchase or sale of a security of the debtor, the Mockoviaks seek to subordinate the full amount pursuant to the mandates of 11 U.S.C. § 510(b).

6.    In addition, to the foregoing, the Mockoviaks bring this action to preserve their rights and interests in the face of a purposeful, unlawful, and inequitable scheme perpetrated by Souri and LQD, to acquire CPI and the Mockoviaks real property, personal property, and assets through the mechanism of the Loan Agreements.

7.    The Loan Agreements, Forbearance Agreement, Management Services Agreement, and Stock Pledge Agreement, and LQD and Souri's post-contractual conduct as discussed in detail below, form the basis for a judgment in favor of the Mockoviaks for: (i) violation of Racketeer Influenced and Corrupt Organizations Act pursuant to 18 U.S.C. § 1964(c) [against LQD, Agent, and Souri]; (ii) breach of fiduciary duties under New Jersey law [against Souri]; (iii) breach of fiduciary duties under Illinois law [against Souri]; (iv) breach of duty of care and loyalty under New Jersey law [against Souri]; (v) breach of duty of care and loyalty under Illinois law [against Souri]; (vi) breach of duty of good faith and fair dealing under New Jersey law [against Souri]; (vii) breach of duty of good faith and fair dealing under Illinois law [against Souri]; (viii) gross negligence under New Jersey law [against Souri]; (ix) intentional interference with business relationships under New Jersey law [against LQD and Agent]; (x) indemnification under New Jersey law [against Souri]; (xi) contribution under New Jersey law [against Souri]; (xii) equitable accounting under New

3



Jersey law; (xiii) lender liability under Illinois law [against LQD and Agent]; (xiv) negligent impairment of collateral under Illinois law [against LQD and Agent]; (xv) avoidance and recovery of preferential transfers pursuant to 11 U.S.C. §§ 547 and 550 [against LQD and Agent]; (xvi) avoidance of transfer pursuant to 11 U.S.C. § 544 and N.J.S.A. 25:2-20-25:2-34 [against LQD and Agent]; (xvii) equitable subordination of LQD's claims pursuant to 11 U.S.C. § 510(c) [against LQD and Agent]; and (xviii) declaratory judgment [against LQD and Agent].

8.      In short, entry of the relief sought herein will have a profound impact on the contours of the contemplated asset sale and recoveries in these proceedings and will fundamentally and rightly alter a *status quo* in which LQD and Agent's claims are presumed to dominate over unsecured claims, wrongly disenfranchising and usurping unsecured creditors.

## THE PARTIES

9.      Robert Mockoviak is a resident of Palm Beach County, Florida, above eighteen (18) years of age, and otherwise *sui juris*.

10.     Sandra Mockoviak is a resident of Palm Beach County, Florida, above eighteen (18) years of age, and otherwise *sui juris*.

11.     LQD is a Delaware limited liability company, organized and existing under the laws of Delaware.

12.     Agent is a Delaware limited liability company, organized and existing under the laws of Delaware.  Upon information and belief, Agent was not directly involved in the Loan Agreements.

13.     Upon information and belief, Souri is a resident of Lake County, Illinois, above eighteen (18) years of age, and otherwise *sui juris*.  Souri is the CEO of LQD.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C.



§ 157(b)(2)(A)and (O) of the Federal Rules of Bankruptcy Procedure, and because this adversary proceeding arises in and is related to the case styled as *In re Robert J. Mockoviak and Sandra H. Mockoviak*, Case No. 20-14372-BKC-MAM currently pending in the United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division.

15.     Venue of this adversary proceeding in this District is proper under 28 U.S.C. §§ 1408 and 1409(a).

16.     All conditions precedent to the bringing of this action have been performed, waived, satisfied, or have occurred.

### PROCEDURAL BACKGROUND

17.     On April 10, 2020, ("**Petition Date**"), the Mockoviaks filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division.

18.     On April 22, 2020, the Mockoviaks filed an *Adversary Complaint* against Defendants, alleging claims for: (i) avoidance and recovery of preferential transfers pursuant to 11 U.S.C. §§ 547 and 550; (ii) equitable subordination pursuant to 11 U.S.C. § 510(c); (iii) breach of duty of good faith and fair dealing; (iv) breach of fiduciary duties; (v) economic duress; (vi) intentional interference with business relationships; and (vii) declaratory judgment, purportedly arising from a purposeful, unlawful, and inequitable scheme perpetrated by Defendants to defraud the Mockoviaks and acquire their company [Clinical Professionals, Inc.], real property, personal property, and assets [ECF Mock. Ad. No. 1] (the "**Complaint**").

19.     On June 19, 2020, the Defendants filed a *Motion to Dismiss Plaintiffs' Complaint with Incorporated Memorandum of Law* [ECF Mock. Ad. No. 12] (the "**Motion to Dismiss**").

20.     On July 24, 2020, the Court entered an Order Granting Enlargement of Time to Amend Complaint and Amending Order Setting Hearing and Response Deadline on Defendants' Motion to Dismiss [ECF Mock. Ad. No. 34] (the "**Order**").  The Order allows



the Plaintiffs to amend their Complaint, "once as a matter of course," on or before Friday, July 24, 2020.

21.    To date, no trustee or committee of creditors has been appointed.

## FACTUAL BACKGROUND

**A.    THE MOCKOVIAKS CREATION AND GROWTH OF CPI.**

22.    On December 27, 1999, Robert Mockoviak formed and/or otherwise incorporated CPI in Princeton, New Jersey.  CPI is a full-service contract research organization providing clinical study management services to the pharmaceutical, medical device, and biotechnological industries across a number of therapeutic areas.  CPI provides a wide range of services, including, but not limited to, clinical project management, quality assurance and auditing, regulatory compliance, data management, and medical writing.

23.    Through the concerted efforts of CPI's President, Robert Mockoviak, CPI's Executive Vice President of Business Development, Sandra Mockoviak, and CPI's Chief Operating Officer, Eric Richardson ("**Richardson**"), CPI enjoyed rapid growth.  Over time, CPI secured clinical research/trial agreements with some of the largest pharmaceutical and medical device companies in the world, including Pfizer, Bayer, Medtronic, Smith and Nephew, Zona, Integra, and Canopy, and significantly grew its workforce.

**B.    CHALLENGES TO CPI'S GROWTH.**

24.    While CPI experienced significant growth, it remained one of the smaller clinical research organizations in the United States and was dependent on the timely receipt of payment from its pharmaceutical and medical device clients.  CPI found itself requiring additional financing and capital in 2018 to cover gaps in its cash flow as a result of several issues common to the clinical research industry, including:

(i)    Remittance of payment to CPI anywhere from 60-180 days after the clinical trial and/or work had been completed;



(ii)     Remittance of payment to CPI being "pegged" to certain goals, including, but not limited to, milestone contractual payments, with payment being remitted 45-60 days thereafter;

(iii)    Failure to remit full and/or proper payment of the amounts due to CPI;

(iv)     CPI's inability to obtain prompt responses to their payment delay inquiries; and

(v)      Change in orders, resulting in payment delays of up to 6 months.

At the same time, because its employees were actively managing clinical trials and tracking projects, CPI could not afford to cut certain costs and/or reduce the number of its employees.

**C.     BY 2018 CPI HAS AN IMPLIED VALUATION OF OVER $20 MILLION.**

25.     In an effort to obtain additional capital for CPI, the Mockoviaks turned to Palm Beach Capital to secure funding for CPI.

26.     In or about June of 2018, CPI entered into an Amended Operating Agreement with a number of partners from Palm Beach Capital (the "**Investors**"), in exchange for an investment in CPI (the "**Amended Operating Agreement**").  *A true and correct copy of the Amended Operating Agreement is attached hereto as **Exhibit A**.*  Specifically, under the terms of the Amended Operating Agreement, Robert Mockoviak pledged and/or assigned 15% of his security interest and shares of common stock in CPI to the Investors in exchange for an initial investment of $2,000,000.00 (the "**Initial Investment**") into CPI.

27.     Thereafter, on October 18, 2018, the Investors invested an additional $1,000,000.00 (the "**Subsequent Investment**") into CPI.  The Subsequent Investment was contemplated and/or otherwise reflected in the 15% of shares of common stock in CPI furnished to the Investors.

28.     The combined Initial Investment and Subsequent Investment in CPI in exchange for 15% of the shares of common stock in CPI evidences that, as of at least October 18, 2018, the Mockoviaks and the Investors estimated CPI to have a total valuation of



approximately $20,000,000.00 (the "**CPI Valuation**").

29.     The Mockoviaks utilized both the Initial Investment and Subsequent Investment to continue CPI's growth initiative.  But, because of the above-described challenges faced in the clinical research industry, particularly the extended 60-180 days cash flow cycles and client change orders that delayed their remittance of payment by up to 6 months, CPI required additional liquidity to cover those extended periods of non-payment.

**D.     CPI'S UNFORTUNATE INTRODUCTION TO LQD.**

30.     As a result of CPI's continuous growth in 2019 and the above-described issues, particularly the varying payment cycles (*i.e.*, 60-120-180 days), the Mockoviaks turned to Matthew Cohen, President of Noble Funding, LLC ("**Cohen**"), to secure additional financing and/or funding for CPI.  Shortly thereafter, Cohen introduced the Mockoviaks to Souri and LQD.

31.     In July of 2019, Cohen referred CPI and CPI subsequently hired Reginald E. McGaugh, CEO of Cornhusker Capital ("**McGaugh**"), to prepare an accounts receivables report and cash flow statement for CPI to submit as part of its loan application to LQD. Based on the accounts' receivables report and cash flow statement prepared by McGaugh, as of August 2019, CPI had an estimated cash basis valuation of approximately $27,000,000.00.

32.     On August 23, 2019, the Mockoviaks and CPI entered into two LQD Business Finance Loan Agreements with LQD: one in the principal amount of $5,250,000.00 and the other in the sum of $1,500,000.00 (collectively, the "**Loan Agreements**").  *True and correct copies of the Loan Agreements are attached hereto as **Composite Exhibit B**.*  The first loan, in the principal sum of $5,250,000.00, was contingent on the total availability of account receivables, while the second loan, in the principal amount of $1,500,000.00, was provided as a term loan.

33.     Further, LQD required that the Mockoviaks execute the Loan Agreements as, at best, an accommodation party.  At no time did the Mockoviaks receive anything of

8



value in exchange for their execution of the Loan Agreements.

34.     Immediately before CPI and the Mockoviaks execution of the Loan Agreements, on August 21, 2019, LQD and Agent filed and/or otherwise recorded a UCC Financing Statement with the State of New Jersey, Division of Revenue and Enterprise Services UCC Section against the Mockoviaks and CPI (the "**New Jersey UCC**"). *A true and correct copy of the New Jersey UCC is attached hereto as **Exhibit C**.*  The New Jersey UCC defines the "collateral" covered as "[A]ll of the Debtor's assets and personal property currently owned or later acquired and all proceeds thereof."

35.     To date, CPI and the Mockoviaks have been unable to locate any security agreement executed between the Mockoviaks and CPI, on one hand, and LQD, on the other.

**E.     LQD MANIPULATES THE TERMS OF LOAN AGREEMENTS.**

36.     With full knowledge that the Mockoviaks had ceased negotiations with other financial institutions and lenders and that CPI was dependent on the forthcoming loans, LQD pulled the Loan Agreements immediately before the Mockoviaks' execution of same. Specifically, Souri informed the Mockoviaks that required additional information concerning an additional bank account that CPI utilized to pay its vendors before CPI and the Mockoviaks could proceed to execute the Loan Agreements.

37.      After "yanking back" the Loan Agreements from the Mockoviaks, LQD and Souri changed material terms in the Loan Agreements, including, but not limited to, the appointment of a new Chief Financial Officer for CPI.

38.     Immediately after LQD delivered the modified Loan Agreements to the Mockoviaks, Souri contacted the Mockoviaks and threatened to rescind the loans if they did not return the executed Loan Agreements within three (3) hours.  In urgent need of the funds and without any opportunity to review and discuss LQD's last-minute revisions to the Loan Agreements with their attorneys, the Mockoviaks and CPI executed the Loan Agreements.

**F.     THE MOCKOVIAKS AND CPI'S COMPLIANCE WITH LOAN TERMS.**

39.     From the inception of the loans with LQD, CPI and the Mockoviaks complied



with the provisions of the Loan Agreements, including, but not limited to, timely remittance of the installment payments required under the Loan Agreements to LQD and submission of any and all required financial statements and documentation for themselves and CPI.

40.    Through February of 2020, CPI never missed and/or otherwise failed to make any payment required under the terms of its Loan Agreements with LQD.  In fact, CPI even delayed payment of its December 2019 employee payroll to ensure that its monthly payments to LQD under the Loan Agreements were timely remitted.

**G.    LQD'S FRAUDULENT ACTIONS IN CONNECTION WITH THE LOAN AGREEMENTS.**

**(I)    LQD'S GRANTING AND UNDERHANDED WITHDRAWAL OF EXEMPTION PERMITTING CLIENTS' DEPOSIT OF THEIR ACCOUNT RECEIVABLE PAYMENTS INTO CPI'S OPERATING ACCOUNT.**

41.    In September and October of 2019, CPI experienced a slowdown in the payment of its accounts' receivables.  Specifically, because clients in the pharmaceutical industry typically "close their markets" during this time and otherwise refrain from remitting payment on outstanding invoices until end of year (*i.e.*, late November/December), CPI experienced a cyclical diminution in its cash flow.

42.    In or about December of 2019, Pfizer - CPI's largest client - expressed concerns to CPI about remitting payment of the amounts due and owing to CPI [approximately $3,400,000.00] to the lockbox account established by LQD under the Loan Agreements.   Specifically, Pfizer informed Richardson that, because its contractual agreements contained strict confidentiality provisions, the deposit of its account receivable payments into a third-party lockbox could constitute a breach and/or violation of that confidentiality.

43.    Immediately thereafter, Sandra Mockoviak contacted LQD's Account Manager, Tom Greene ("**Greene**"), to inform him that: (i) two (2) significant wire transfers were forthcoming from Pfizer in payment of CPI's accounts receivables, (ii) CPI required a quick turnaround on the Pfizer payments, and (iii) CPI required an exemption from LQD for Pfizer's account receivable payments to be deposited into CPI's Bank of America Operating



Account (the "**CPI Operating Account**") rather than LQD's designated lockbox so that it could immediately apply the funds towards its outstanding payroll, vendor payments, site payments, statistical teams, and other operational expenses (*i.e.*, as opposed to depositing the funds into LQD's lockbox and awaiting disbursement of same). Given that LQD had access to and maintained constant visibility into the CPI Operating Account and regularly received copies of the bank statements for the CPI Operating Account, Greene confirmed that he would keep an eye out for the Pfizer payments.

44.     Thereafter, Sandra Mockoviak notified Greene that Pfizer had deposited its November 2019 and December 2019 payments [totaling approximately $3,400,000.00] (the "**Pfizer Payments**") into the CPI Operating Account rather than LQD's designated lockbox. In addition, Sandra Mockoviak reiterated to Greene that CPI required a quick turnaround on the Pfizer Payments in order to pay outstanding payroll, vendor payments, site payments, statistical teams, and other operational expenses.

45.     Greene stated that he understood CPI's situation and agreed that LQD would provide CPI with an exemption. Shortly thereafter, CPI utilized the Pfizer Payments to pay outstanding payroll, vendor payments, site payments, and other operational expenses.

### (II)    THE MOCKOVIAKS' SECURING OF ADDITIONAL FINANCING FOR CPI.

46.     Because of Souri's unsubstantiated contentions that CPI was outside of its borrowing base and the account reconciliations for CPI were not adequate, LQD refused to provide CPI with the funding required under the Loan Agreements. As a result, the Mockoviaks necessitated additional capital to cover CPI's payroll and employee expenses and/or otherwise compensate CPI's employees, remit site and vendor payments, and pay/satisfy some of the operating expenses and costs of CPI.

47.     In January 2020, the Mockoviaks spoke with McGaugh about CPI's ability to secure additional third-party financing to fund CPI's payroll and ongoing operational expenses. At that time, McGaugh informed the Mockoviaks that a cash advance from a third-party lender would not constitute an event of default under the Loan Agreements



and/or otherwise be a "problem."

48.     After communicating with McGaugh, on January 6, 2020, CPI entered into an Agreement for the Purchase and Sale of Future Receipts with Global Merchant Cash, Inc. ("**Global Merchant**") in the approximate sum of $500,000.00 (the "**Future Receipts Agreement**").   *A true and correct copy of the Future Receipts Agreement is attached hereto as Exhibit D.*

49.     CPI immediately applied the proceeds of the Futures Receipts Agreement towards the payment of CPI's outstanding payroll and employee expenses, outstanding site payments and vendor payments, and outstanding operational expenses that LQD had refused to fund.  CPI was thus able to stay in business.

   **(III)   LQD'S SPURIOUS DEFAULT DECLARATION.**

50.     Notwithstanding the parties' agreement, in or about January 23, 2020, Souri - without any reasoning and/or explanation - told the Mockoviaks that CPI was in "technical" default under the Loan Agreements.   Specifically, Souri informed the Mockoviaks that: (i) CPI's failure to provide LQD with certain financial statements within an unreasonably limited period of time; (ii) CPI's securing of additional financing from Global Merchant; and (iii) CPI's failure to compel Pfizer to deposit the Pfizer Payments into LQD's designated lockbox, all constituted events of "technical" default under the Loan Agreements.

51.     Further, without any notice to and/or permission from CPI, LQD began directly contacting Pfizer and other clients of CPI, demanding that they deposit any accounts receivables payments due and owing to CPI into LQD's lockbox.  In fact, the Hard Money Lender even threatened to charge Pfizer twice the amount of Pfizer Payment unless it immediately deposited the Pfizer Payment into LQD's designated lockbox.

52.     Upon information and belief, at no point during all of this time did LQD furnish the Mockoviaks and CPI with a written notice of default, declaring the Loan Agreements to be in default as a direct result of the Pfizer Payment being deposited into



CPI's operating account.

53.     As a direct and proximate result of LQD's actions, Pfizer refused to continue remitting payment of future account receivables to CPI.

**(IV)   LQDs Malicious Disclosure of the Mockoviaks' Personal Information to CPI's Clients.**

54.     On January 23, 2020, the Mockoviaks were shocked to discover that Souri had begun sending email correspondences enclosing copies of the Loan Agreements containing the Mockoviaks' personal information (*i.e.*, residence address, social security numbers, driver's licenses, salaries, etc.)  to CPI's clients who, in turn, provided same to CPI's employees.   Specifically, because CPI's clients could not understand why such personal confidential information was being disclosed to them, CPI's clients reached out to the employees of CPI to obtain an explanation as to why they were receiving such documentation and information from LQD.

55.     Shortly thereafter, on January 23, 2020, Souri had a conference call with the Mockoviaks, Richardson, Robert Goldstein [Managing Partner of Five G. Capital Partners, LLC] ("**Goldstein**"), and Geno Ruggles [LQD's Account Relationship Manager] ("**Ruggles**") (the "**January 23rd Call**").

56.     During the January 23rd Call, Richardson and CPI's Vice President of Business Development, Justin Wishon ("**Wishon**"), began receiving emails from CPI's clients, including, but not limited to, Pfizer, Medtronic, and Smith and Nephew, informing them that LQD had emailed them copies of the documentation containing the Mockoviaks' personal information and inquiring as to why said information was being disclosed to them.

57.     Upon receipt of the client emails, Richardson immediately informed Sandra Mockoviak and, together, they expressed concern about the disclosure of said personal information to CPI's clients during the January 23rd Call.  At that time, Sandra Mockoviak and Richardson informed Souri that because of the ongoing funding issues and other problems encountered in connection with LQD's loans, CPI had been unable to pay its January 15th payroll and did not anticipate being able to cover its January 30th payroll.



58.     During the January 23rd Call, Souri stated that, upon the Mockoviaks and CPI delivery of updated financial statements and information to Hard Money Lender, LQD would cover CPI's payroll and/or otherwise fully compensate CPI's employees.

59.     In addition, during the January 23rd Call, Souri denied that LQD had sent copies of the Loan Agreements to CPI's clients and, after being confronted with the client emails, placed the call on an extended hold and, ultimately, concluded/terminated the call without any explanation.

60.     Unbeknownst to the Mockoviaks, Souri's false denials and requests for updated financial information were laying the groundwork for the litigation and resulting collection efforts that LQD would pursue against the Mockoviaks and CPI only one day later.

61.     Notwithstanding, Souri and Ruggles continued calling and sending FedEx packages and certified letters containing copies of the Loan Agreements to CPI's clients. In addition, the Hard Money Lender continued to harass CPI's clients by threatening to charge them twice the amount of their account receivables if they did not immediately deposit payment into LQD's designated lockbox. When CPI's clients, including Pfizer, refused to remit payment to the lockbox, LQD threatened to institute litigation against them.

(v)     **CPI's Clients Express Significant Concerns.**

62.     In response to LQD's actions, a number of CPI's clients, including, but not limited to, Pfizer, Medtronics, Zona, and Smith and Nephew, contacted Wishon and Richardson to express their concern over LQD's disclosure of the confidential information contained in the Loan Agreements and inquire as to the reasons for LQD's involvement/meddling into their business relationships with CPI.

63.     Moreover, CPI's clients informed Wishon and Richardson that they were extremely concerned that LQD may have obtained unauthorized access to their contractual agreements with CPI, thereby exposing information to an unknown third-party that for privacy reasons CPI was required to maintain confidential.

64.     Ultimately, the actions undertaken by Souri and LQD: (i) caused CPI's



clients to lose confidence in CPI, (ii) led to CPI's clients refusing to remit payment of account receivables to CPI and, (iii) resulted in the termination of their business relationships with CPI.

65.    LQD's actions not only destroyed CPI's business relationships with its existing clients, resulting in CPI's inability to collect on its significant outstanding account receivables, but also ruined and/or otherwise precluded CPI from performing under new contracts it had already entered into and was scheduled to begin in 2020 with new clients, including, but not limited to, Reflexion and Canopy.

**(VI)    LQD'S RECORDATION OF THE PREFERENTIAL UCC FINANCING STATEMENTS.**

66.    As further evidence of LQD's malicious actions, on January 27, 2020, LQD filed and/or otherwise recorded a UCC Financing Statement with the Pennsylvania Department of State against the Mockoviaks (the "**Pennsylvania UCC**"). *A true and correct copy of the Pennsylvania UCC is attached hereto as Exhibit E.* While the Pennsylvania UCC defines the "collateral" covered as "[A]ll of the Debtor's assets and personal property currently owned or later acquired and all proceeds thereof," the Pennsylvania UCC did not identify CPI as a "debtor" and is otherwise entirely devoid of any reference to CPI.

67.    In addition, on January 27, 2020, LQD filed and/or otherwise recorded a UCC Financing Statement with the Florida Secured Transaction Registry against the Mockoviaks (the "**Florida UCC**"). *A true and correct copy of the Florida UCC is attached hereto as Exhibit F.* While the Florida UCC defines the "collateral" covered as "[A]ll of the Debtor's assets and personal property currently owned or later acquired and all proceeds thereof," the Florida UCC also did not identify CPI as a "debtor" and is otherwise entirely devoid of any reference to CPI.

**H.    LQD'S MISREPRESENTATIONS AND INEQUITABLE ACTIONS.**

**(I)    LQD'S FRAUDULENT REPRESENTATIONS TO INDUCE MOCKOVIAKS INTO POST-LOAN AGREEMENTS.**

68.    By the beginning of 2020, LQD's inequitable actions and refusal to provide



funding under the Loan Agreements placed CPI on a collision course to disaster.

69.     On February 7, 2020, Souri made a demand on the Mockoviaks. Specifically, Souri told the Mockoviaks that LQD would refrain or forbear from seeking collection of the amounts purportedly due under the Loan Agreements and compensate CPI's employees provided - amongst other things - that the Mockoviaks and CPI: (i) executed a forbearance agreement; (ii) executed an agreement appointing an individual of Souri's choosing to be the chief restructuring officer for CPI; and (iii) executed an agreement pledging and/or assigning their security interest and shares of common stock in CPI, together with all voting and income/dividend rights thereunder, to LQD. It was at this time that LQD began manifesting and evidencing its true intentions in connection with CPI and the Mockoviaks.

70.     Later that same day, left with no other alternative, CPI and the Mockoviaks [in their capacities as accommodation parties] executed a Forbearance and Reaffirmation Agreement with LQD, temporarily forbearing from pursuing collection of the Loan Agreements and requiring CPI and the Mockoviaks to - among other things - execute a: (i) Management Services Agreement; (ii) deposit account control agreement in favor of LQD; and (iii) equity interest pledge agreement in favor of LQD (the "**Forbearance Agreement**"). *A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit G**.* The executed Forbearance Agreement was to be held in escrow by counsel for CPI and the Mockoviaks, pending resolution of some final issues with LQD.

71.     Shortly thereafter, Souri informed CPI and the Mockoviaks that LQD was rescinding and/or otherwise withdrawing the Forbearance Agreement based upon the Mockoviaks' purported failure to comply with the terms thereof. Specifically, Souri contended that, because of the Mockoviaks [an accommodation party] refusal to sign over their personal real property and assets to LQD as part of the Forbearance Agreement, LQD was unwilling to proceed with same in connection with CPI.

72.     The Forbearance Agreement was never fully executed and/or otherwise consummated between LQD, on one hand, and CPI and the Mockoviaks, on the other. Moreover, even if the Forbearance Agreement were somehow deemed to be effective and/or



otherwise in force and effect between the parties, LQD breached the Forbearance Agreement by failing and/or refusing to forbear or discontinue its efforts to pursue collection of the Loan Agreements against CPI.

### (II) GOLDSTEIN BREAKS INTO CPI'S OFFICES AND MANAGEMENT.

73. Goldstein is a long-time associate of Souri. Upon information and belief, Goldstein has worked in conjunction with Souri in similar capacities (i.e., advisor, selected chief restructuring officer) on other deals and/or loans funded by LQD.

74. On February 10, 2020, Goldstein appeared at the building where CPI's offices are located. At the time, Goldstein knew that the Mockoviaks were not present in CPI's offices. Through his misrepresentations, Goldstein gained access to CPI's offices.

75. Specifically, Goldstein falsely communicated to the building superintendent that he was an employee of CPI, had stepped out of the office to utilize the restroom and, accidentally, locked himself out of CPI's office. Based on Goldstein's fraudulent representations, the superintendent provided him with unfettered access to CPI's office and allowed Goldstein to remain in the office unsupervised for a significant period of time.

76. Immediately upon learning of Goldstein's unauthorized entry into CPI's office, Sandra Mockoviak sent an email correspondence to LQD, Souri, and Goldstein, notifying them of Goldstein's trespass into CPI's office, the potential breach of confidentiality under HIPPA, and LQD's potential liability for Goldstein's wrongful actions.

### (III) SOURI AND LQD "TORPEDO" $9 MILLION INVESTMENT INTO CPI.

77. As a result of the numerous above-described difficulties that CPI encountered in obtaining the requisite funding from LQD, the Mockoviaks - sometime in late November/December 2019 - began seeking additional capital investments into CPI. In furtherance of their efforts, the Mockoviaks requested that McGaugh conduct a formal analysis of CPI's financials and, based on his analysis, prepare a financial forecasting report to be provided to potential investments.

78. After careful analysis and review of CPI's financial books and records, on



December 4, 2019, McGaugh prepared a Customer and Contract Waterfall for CPI (the "**Waterfall**").  The Waterfall reflected total projected revenues of: (i) $10,576,000.00 for the year 2019; (ii) $20,385,148 for the year 2020; (iii) $27,407,795 for the year 2021; and (iv) $24,847,424 for the year 2022.

79.     Over the next several weeks, CPI provided the Waterfall and other financial documentation to prospective investors resulting in significant interest.  In fact, CPI had as many as ten (10) different entities and/or parties interested in investing significant capital into CPI.  Of those interested parties, Emigrant presented the most appealing opportunity.

80.     In February of 2020, Sandra Mockoviak met with representatives of Emigrant to discuss a potential investment in CPI.  Some days later, on February 13, 2020, Emigrant submitted a written proposal to CPI, evidencing a willingness to invest approximately $9,000,000.00 into CPI.

81.     Immediately upon learning of Emigrant's pending investment into CPI, Souri - without any notice to or communication with the Mockoviaks - contacted Emigrant and discussed its impending investment into CPI.  Upon information and belief, during those communications with representatives of Emigrant, Souri made several false statements and representations about CPI and the Mockoviaks.

82.     Shortly thereafter, as a result of Souri's false and misleading statements about CPI and the Mockoviaks, Emigrant withdrew its proposal and rescinded its proposed investment into CPI.

**(IV)    SOURI APPOINTS HIS CLOSE FRIEND, GOLDSTEIN, CHIEF RESTRUCTURING OFFICER OF CPI.**

83.     Having successfully sabotaged Emigrant's potential $9,000,000.00 investment into CPI, Souri moved forward with his ongoing efforts to seize control of the management and operation of CPI.

84.     On February 12, 2020, Souri and LQD demanded that CPI enter into a Management Services Agreement with Five G. Capital Partners, LLC ("**Five G**") and its Managing Partner, Goldstein, designating Goldstein the Chief Restructuring Officer of CPI



(the "**Management Services Agreement**"). *A true and correct copy of the Management Services Agreement is attached hereto as **Exhibit H**.* The Mockoviaks were not afforded any say in the appointment of Goldstein as CPI's Chief Restructuring Officer.

85.    Immediately thereafter, Souri began exercising control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records.

(V)    AMENDMENT TO THE LOAN AGREEMENTS.

86.    Having already assumed all elements of control over CPI and as a prelude to its intended takeover of CPI, on February 14, 2020, CPI and the Mockoviaks [in their capacities as accommodation parties] entered into a Loan Amendment with LQD (the "**Amendment**"). *A true and correct copy of the Amendment is attached hereto as **Exhibit I**.* In exchange for their execution of the Amendment, Souri agreed that LQD would provide CPI with additional funding in the sum of $750,000.00, meet CPI's payroll and/or compensate its employees, and otherwise move forward with the operation of CPI.

87.    Later that same evening, Goldstein called Sandra Mockoviak while at a "Valentine's Day" dinner at a restaurant and demanded that she and Robert Mockoviak immediately return home, execute a pledge agreement, and return same to LQD that same night. Souri threatened that if the pledge agreement was not executed within the next few days, CPI and the Mockoviaks would suffer serious consequences.

(VI)    LQD'S WRONGFUL TAKEOVER OF CPI.

88.    On February 21, 2020, Souri demanded that Robert Mockoviak immediately execute a stock pledge agreement in favor of LQD. During that communication, Souri informed the Mockoviaks that LQD would only cover CPI's payroll and otherwise compensate CPI's employees for their salaries and earned wages if Robert Mockoviak executed the appropriate pledge agreement.

89.    Shortly thereafter, on February 21, 2020, in reliance on George Souri's statements and representations and in an effort to protect CPI's employees, Robert



Mockoviak executed a Stock Pledge Agreement in favor of LQD, pledging and/or assigning his security interest and shares of common stock in CPI, together with all voting and income/dividend rights thereunder, to LQD (the "**Pledge Agreement**"). *A true and correct copy of the Pledge Agreement is attached hereto as **Exhibit J**.*

90.    It was only later that Robert Mockoviak discovered that certain terms and provisions in the Pledge Agreement that he and the Mockoviaks' attorneys had negotiated with LQD had been changed without his knowledge and/or consent. As a result, the Pledge Agreement that Robert Mockoviak signed was significantly different from the one that had previously been negotiated and agreed upon.

91.    To the shock and surprise of the Mockoviaks, immediately after Robert Mockoviak's execution of the Pledge Agreement on February 21, 2020, Souri: (i) informed the Mockoviaks that LQD had taken over the management and operation of CPI; (ii) refused to allow the Mockoviaks to enter CPI's offices and precluded them from accessing CPI's financial accounts and books and records; and (iii) demanded that the Mockoviaks resign from CPI.

92.    Specifically, Souri falsely informed the Mockoviaks that LQD would refrain from pursuing any amounts purportedly due under the Loan Agreements against the Mockoviaks personally and compensate CPI's employees if the Mockoviaks resigned from the management of CPI. While LQD did make one of CPI's employee payrolls for February 2020, LQD and Souri made every deduction possible from those payroll payments and, ultimately, failed and/or otherwise refused to pay any subsequent payrolls for CPI and/or the payroll taxes that accumulated thereon.

93.    Moreover, Souri failed and/or otherwise refused to pay the monthly rent due and owing on CPI's office and stopped paying the health insurance premiums for CPI's employees.

94.    Later that same day, Goldstein resigned as Chief Restructuring Officer for CPI, leaving Souri and LQD in exclusive control of CPI.

20



95.     On February 22, 2020, Souri conducted an analysis of CPI's invoices through February 15, 2020 and qualified which invoices could be "pegged" to the borrowing base certificate required under the Loan Agreements. At the time of Souri's analysis, CPI had a remaining outstanding net of $2,500,000.00 of collectable accounts receivables due and owing to it.

96.     Realizing the significant value of CPI, on February 29, 2020, Souri, in his capacity as CEO of LQD, executed a Written Consent of the Majority Shareholder of CPI: (i) appointing himself as the sole director of CPI; and (ii) acknowledging LQD's entitlement to vote the shares held by Robert Mockoviak in CPI (the "**Written Consent**"). *A true and correct copy of the Written Consent is attached hereto as **Exhibit K***.

97.     In addition, that same day, Souri, in his capacity as Director of CPI, executed a Corporate Action By Consent of the Board of Directors of CPI: (i) removing Richardson as Chief Executive Officer and naming Goldstein as Interim Chief Executive Officer; (ii) adopting the Management Services Agreement; and (iii) naming Richardson as Director of Operations with the caveat that he report directly to Goldstein (the "**Corporate Action by Consent**"). *A true and correct copy of the Corporate Action by Consent is attached hereto as **Exhibit L***.

98.     At this point in time, Souri and LQD had completed their fraudulent pre-planned takeover of CPI, leaving LQD fully and exclusively in charge of CPI.

**(VII)    LQD'S FRAUDULENT REPRESENTATIONS TO CPI'S EMPLOYEES.**

99.     On March 9, 2020, in furtherance of his role as Director of CPI, Souri had a conference call with the employees of CPI to discuss the status of CPI (the "**March 9th Call**"). Although the March 9th Call was supposed to include all of the employees of CPI, Souri intentionally excluded a family member of the Mockoviaks [and employee of CPI], so as to prevent that family member from discussing the substance of the March 9th Call with the Mockoviaks.

100.    During the March 9th Call, Souri informed CPI's employees that: (i) he



intended to manage and operate CPI going forward; (ii) he was going to compensate the employees for their earned wages and salaries; and (iii) he was in contact with a third-party to secure additional financing to assist LQD with the next steps to be taken so that CPI could continue operating and servicing its clients into the future.

### (VIII)    SOURI AND LQD TRY TO ABANDON CPI LIKE A HIT-AND-RUN DRIVER FLEEING THE SCENE OF THE ACCIDENT.

101.    At the inception of the Loan Agreements, CPI had more than sufficient collateral to cover and otherwise repay the proceeds of the Loan Agreements to LQD.  But Souri and LQD - through their fraudulent and inequitable actions - managed to destroy CPI within 30 days of their takeover.

102.    The week of March 9th, CPI's remaining clients began terminating their contractual relationships with CPI.  Shortly thereafter, on March 13, 2020, Richardson was unconditionally terminated as Director of Operations for CPI.  Worse yet, CPI employees and vendors started demanding payment of wages and amounts due.

103.    In fact, immediately before his termination on March 13, 2020, Richardson contacted CPI's principal, Timothy Watson ("**Watson**") and informed Watson that CPI's two largest clients - Pfizer and Opko - had terminated and/or otherwise ceased their significant business relationships with CPI as a direct result of statements made by and the conduct of Souri.  In addition, Richardson advised that a number of the new prospective clients identified in the Waterfall, including but not limited to, Bayer, Reflexion, and Canopy had canceled and/or otherwise withdrawn from their pending lucrative agreements with CPI as a result of Souri's actions.

104.    By March 23, 2020, Souri had apparently realized how badly his actions had destroyed CPI's value.  Like a hit-and-run driver fleeing the scene of the accident, Souri purported to terminate LQD's "proxy to vote" Robert Mockoviak's shares in CPI, deemed the Pledge Agreement "null, void and of no further effect," and attempted to revert control and operation of the now essentially defunct CPI to the Mockoviaks.

105.    Souri and LQD's shut down was so abrupt and unexpected that many of



CPI's employees and clients remained unaware that CPI has ceased operations and closed its doors.  In fact, CPI's employees continue to receive emails from clients and sites in connection with ongoing clinical studies in which CPI was involved even after Souri tried to flee the scene.

106.    As a direct and proximate result of the inequitable and fraudulent activities engaged in by Souri and LQD, the Mockoviaks lost the value of the business that they had built-up over 20 years' time and their sole source of income.  They lost a business that had an implied valuation of between $20,400,000.00 to $24,000,000.00.

## J.    LQD'S CONCEALED LAWSUIT AGAINST THE MOCKOVIAKS AND CPI DURING THE TAKEOVER.

### (I)    THE CONCEALED LAWSUIT.

107.    Unbeknownst to the Mockoviaks, and before their and CPI's required execution of the Amendment, Forbearance Agreement, Management Services Agreement, and Pledge Agreement, on January 24, 2020, LQD and Agent filed a Complaint for Confession of Judgment against the Mockoviaks and CPI in the Circuit Court of Cook County, Illinois (the "**Lawsuit**").  The Mockoviaks were not served with process in the Lawsuit and otherwise purposely kept in the dark by LQD and Agent.

108.    On February 7, 2020, in the middle of the forbearance discussions, LQD and Agent obtained a Judgment by Confession in their favor and against the Mockoviaks and CPI in the amount of $6,710,765.00 (the "**Judgment by Confession**").  *A true and correct copy of the Judgment by Confession is attached hereto as **Exhibit M**.*  The Judgment by Confession encompassed damages that could not be ascertained from the Loan Agreements, including future, contingent, unspecified and indeterminate costs and penalties, indemnification obligations and other fees, and included amounts which should have only been determined based on extrinsic evidence.

109.    On February 19, 2020, LQD and Agent obtained the Circuit Court of Cook County, Illinois' issuance of a Citation to Discover Assets to a Third-Party directed to: (i) Bank of America, N.A., (ii) Synovus Bank, (iii) TD Ameritrade, Inc., and (iv) TD Bank,



N.A., requiring that each financial institution provide responses to interrogatories and produce documentation related to CPI and the Mockoviaks (collectively, the "**Citations to Discover Assets**"). *True and correct copies of the Citations to Discover Assets are attached hereto as Exhibit N.* Shortly thereafter, LQD and Agent served garnishment documents on Bank of America, resulting in the freezing of CPI's operating account and the Mockoviaks' personal account(s).

110. It was not until February 21, 2020, after receiving certain Third-Party Citation Notices from the Circuit Court of Cook County, Illinois, that the Mockoviaks first learned about the Lawsuit. Upon learning of the Lawsuit, the Mockoviaks took immediate action, including obtaining a copy of the court file and retaining local counsel in Illinois to represent their interests in the Lawsuit.

### (II) IMMEDIATE ACTIONS UNDERTAKEN BY THE MOCKOVIAKS TO ADDRESS THE CONCEALED LAWSUIT.

111. On March 9, 2020, the Mockoviaks and CPI filed a Motion to Reopen and Vacate February 7, 2020 Judgment, with supporting Affidavits (the "**Motion to Vacate**"), and Motion to Quash and Dismiss, or in the Alternative Stay, Citations to Discover Assets (the "**Motion to Quash**"). *True and correct copies of the Motion to Vacate and Motion to Quash are attached hereto as Composite Exhibit O.*

112. On March 10, 2020, the Circuit Court of Cook County, Illinois conducted a hearing on the Motion to Quash and, thereafter, entered an Order: (i) extending and continuing the Citations to Discover Assets until May 11, 2020; and (ii) requiring that all accounts and sums applicable to the Citations to Discover Assets continue to be held until further order of the court (the "**Order on Motion to Quash**"). *A true and correct copy of the Order on Motion to Quash is attached hereto as Exhibit P.*

113. The Circuit Court of Cook County, Illinois scheduled a hearing on the Motion to Vacate for March 19, 2020. But, due to the Coronavirus pandemic, the hearing was canceled and has yet to be rescheduled by the Court.

114. As a result, while the proceedings are tolled, the Mockoviaks' personal bank



accounts remain frozen and they are unable to access any funds to pay their day-to-day expenses.

## CAUSES OF ACTION

### COUNT I – VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT PURSUANT TO 18 U.S.C. § 1964(C)
### (AGAINST LQD, AGENT, AND SOURI)

115.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

116.    LQD had knowledge of CPI's existing contractual agreements with its clients, including, but not limited to, Pfizer, Medtronic, Zona, and Smith and Nephew, and the clients' obligations thereunder, including, but not limited to, their obligations to remit payment on the outstanding account receivables to CPI.

117.    As officers and shareholders of LQD and accommodation parties under the Loan Agreements, the Mockoviaks are intended third-party beneficiaries of CPI's contractual business relationships with its clients.

118.    LQD intentionally interfered with the contractual agreements by inducing the clients to breach their contractual agreements.

119.    LQD's interference with the contractual agreements, particularly its refusal to allow payments to be deposited into CPI's operating account and threats of billing/charging CPI's clients twice the amount of their accounts receivable and/or resorting to litigation, is without justification or privilege. LQD had no prior economic interest in the transaction. The Hard Money Lender merely had a prospective interest in getting CPI's business and making the loan.

120.    CPI has been damaged by LQD's interference with CPI's contractual agreements with its clients. The Hard Money Lender's actions resulted in CPI's clients withholding payment to CPI on its account receivables which constrained and, ultimately, decimated and destroyed CPI. These monies were due to CPI and LQD should have facilitated the monies being paid to CPI.



121.    LQD's interference with the contractual agreements has impaired the Mockoviaks' collateral, namely CPI's collection of its account receivables, resulting in significant harm and damage to the Mockoviaks.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against LQD and Agent for damages and special damages, including, without limitation, all actual losses suffered by the Mockoviaks as a result thereof and all unjust enrichment flowing to LQD and Agent from the Hard Money Lender's interference with CPI's contractual agreements with its clients, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

**COUNT II – BREACH OF FIDUCIARY DUTIES**
**[UNDER NEW JERSEY LAW]**
**(AGAINST SOURI)**

122.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

123.    By virtue of his involvement as sole Director of a closely held New Jersey corporation, to wit: CPI, Souri owed a fiduciary duty to deal with the officers and shareholders of CPI, including the Mockoviaks, in the best interest of CPI and in a manner consistent with honesty, fairness, and good faith.  In particular, in his capacity as sole Director of CPI, Souri owed a fiduciary duty to not engage in any act of self-dealing for his own benefit and/or the benefit of his company, LQD, or to the detriment of CPI and its shareholders, including the Mockoviaks.

124.    Souri breached his fiduciary duties to the Mockoviaks by crafting and managing CPI in such a way as to ensure that it would default quickly under the Loan Agreements and he and LQD would own and/or otherwise control CPI and acquire the real property, personal property, and assets of the Mockoviaks.  Specifically, Souri breached his duty by:

(i)    Failing to ensure CPI's loan with LQD was properly funded in accordance with the terms of the Loan Agreements;

26



(ii)     Failing and/or refusing to pay CPI's employees their earned wages and salaries until such time as CPI's clients paid their account receivables into an LQD-designated lockbox;

(iii)     Threatening to charge CPI's clients twice the amount of their account receivables if payment was not immediately remitted to an LQD-designated lockbox, and otherwise threatening to institute litigation against CPI's clients;

(iv)     Sending correspondence to CPI's employees and clients enclosing copies of the Loan Agreements and the Mockoviaks personal information (*i.e.*, residence address, social security numbers, salary, etc.) and demanding that they deal directly with and otherwise remit all future payments directly to LQD, causing CPI's clients to believe that CPI was incapable of maintaining information confidential as required under HIPAA requirements/guidelines and resulting in said clients' refusal to remit outstanding payments to CPI;

(v)     Exercising dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records and demanding that the Mockoviaks "resign" from their involvement in CPI;

(vi)     Intentionally interfering with and/or sabotaging Emigrant's proposed capital investment of $9,000,000.00 into CPI; and

(vii)     Rescinding the Pledge Agreement and Written Consent and purportedly resigning as sole Director of CPI after destroying and/or otherwise running CPI into the ground.

125.     As a direct and proximate result of Souri's breaches of fiduciary duties: (i) CPI's business operations have ceased; (ii) the Mockoviaks have been divested of any and all interest that they had in CPI; and (iii) the Mockoviaks have suffered and continue to suffer monetary damages for which Souri is liable as sole Director of CPI.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against



Souri for damages in an amount equivalent to the approximate value of CPI, to wit: approximately $22,000,000.00, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

**COUNT III – BREACH OF FIDUCIARY DUTIES**
**[UNDER ILLINOIS LAW]**
**(AGAINST SOURI)**

126.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

127.    By virtue of his involvement as sole Director of CPI, Souri owed a fiduciary duty to deal with the officers and shareholders of CPI, including the Mockoviaks, in the best interest of CPI and in a manner consistent with honesty, fairness, and good faith.  In particular, in his capacity as sole Director of CPI, Souri owed a fiduciary duty to not engage in any act of self-dealing for his own benefit and/or the benefit of his company, LQD, or to the detriment of CPI and its shareholders, including the Mockoviaks.

128.    Souri breached his fiduciary duties to the Mockoviaks by crafting and managing CPI in such a way as to ensure that it would default quickly under the Loan Agreements and he and LQD would own and/or otherwise control CPI and acquire the real property, personal property, and assets of the Mockoviaks.

129.    Specifically, Souri breached his duty by:

(i)    Failing to ensure CPI's loan with LQD was properly funded in accordance with the terms of the Loan Agreements;

(ii)    Failing and/or refusing to pay CPI's employees their earned wages and salaries until such time as CPI's clients paid their account receivables into an LQD-designated lockbox;

(iii)    Threatening to charge CPI's clients twice the amount of their account receivables if payment was not immediately remitted to an LQD-designated lockbox, and otherwise threatening to institute litigation against CPI's clients;



(iv)    Sending correspondence to CPI's employees and clients enclosing copies of the Loan Agreements and the Mockoviaks personal information (*i.e.*, residence address, social security numbers, salary, etc.) and demanding that they deal directly with and otherwise remit all future payments directly to LQD, causing CPI's clients to believe that CPI was incapable of maintaining information confidential as required under HIPAA requirements/guidelines and resulting in said clients' refusal to remit outstanding payments to CPI;

(v)    Exercising dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records and demanding that the Mockoviaks "resign" from their involvement in CPI;

(vi)    Intentionally interfering with and/or sabotaging Emigrant's proposed capital investment of $9,000,000.00 into CPI; and

(vii)    Rescinding the Pledge Agreement and Written Consent and purportedly resigning as sole Director of CPI after destroying and/or otherwise running CPI into the ground.

130.    As a direct and proximate result of Souri's breaches of fiduciary duties: (i) CPI's business operations have ceased; (ii) the Mockoviaks have been divested of any and all interest that they had in CPI; and (iii) the Mockoviaks have suffered and continue to suffer monetary damages for which Souri is liable as sole Director of CPI.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against Souri for damages in an amount equivalent to the approximate value of CPI, to wit: approximately $22,000,000.00, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### COUNT IV – BREACH OF DUTY OF LOYALTY AND CARE
### [UNDER NEW JERSEY LAW]
### (AGAINST SOURI)

131.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended



Adversary Complaint as if set forth fully herein.

132.    As sole Director of a closely held New Jersey corporation, to wit: CPI, Souri owed a duty of loyalty and care to the officers and shareholders of CPI, including the Mockoviaks.  Specifically, Souri had an obligation to properly manage and operate CPI in a manner that would maximize the benefits to CPI and its shareholders.

133.    Souri breached his duties of loyalty and care to the Mockoviaks by crafting and managing CPI in such a way as to ensure that it would default quickly under the Loan Agreements and he and LQD would own and/or otherwise control CPI and acquire the real property, personal property, and assets of the Mockoviaks.

134.    Specifically, Souri breached his duties by, among other things:

(i)    Failing and/or refusing to pay CPI's employees their earned wages and salaries until such time as CPI's clients paid their account receivables into an LQD-designated lockbox;

(ii)    Failing and/or refusing to pay any payroll taxes due and owing from CPI;

(iii)    Failing and/or refusing to pay the monthly rent due and owing on CPI's office;

(iv)    Failing and/or refusing to make any financial information and/or the books and records of CPI available to the Mockoviaks;

(v)    Exercising dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records and demanding that the Mockoviaks "resign" from their involvement in CPI; and

(vi)    Rescinding the Pledge Agreement and Written Consent and purportedly resigning as sole Director of CPI after destroying and/or otherwise running CPI into the ground.

135.    Souri's breaches of his duties of good faith and fair dealing frustrated and



disappointed the reasonable expectations of the Mockoviaks, thereby decimating and financially ruining CPI and depriving the Mockoviaks of the benefits of their ownership interest therein.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against Souri for damages in an amount equivalent to the approximate value of CPI, to wit: approximately $22,000,000.00, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### COUNT V – BREACH OF DUTY OF CARE AND LOYALTY
### [UNDER ILLINOIS LAW]
### (AGAINST SOURI)

136.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

137.    As sole Director of CPI, Souri owed a duty of loyalty and care to the officers and shareholders of CPI, including the Mockoviaks. Specifically, Souri had an obligation to properly manage and operate CPI in a manner that would maximize the benefits to CPI and its shareholders.

138.    Souri breached his duties of loyalty and care to the Mockoviaks by crafting and managing CPI in such a way as to ensure that it would default quickly under the Loan Agreements and he and LQD would own and/or otherwise control CPI and acquire the real property, personal property, and assets of the Mockoviaks.

139.    Specifically, Souri breached his duties by, among other things:

(i)    Failing and/or refusing to pay CPI's employees their earned wages and salaries until such time as CPI's clients paid their account receivables into an LQD-designated lockbox;

(ii)    Failing and/or refusing to pay any payroll taxes due and owing from CPI;

(iii)    Failing and/or refusing to pay the monthly rent due and owing on CPI's office;



(iv)     Failing and/or refusing to make any financial information and/or the books and records of CPI available to the Mockoviaks;

(v)     Exercising dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records and demanding that the Mockoviaks "resign" from their involvement in CPI; and

(vi)     Rescinding the Pledge Agreement and Written Consent and purportedly resigning as sole Director of CPI after destroying and/or otherwise running CPI into the ground.

140.     Souri's breaches of his duties of good faith and fair dealing frustrated and disappointed the reasonable expectations of the Mockoviaks, thereby decimating and financially ruining CPI and depriving the Mockoviaks of the benefits of their ownership interest therein.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against Souri for damages in an amount equivalent to the approximate value of CPI, to wit: approximately $22,000,000.00, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### COUNT VI – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### [UNDER NEW JERSEY LAW]
### (AGAINST SOURI)

141.     The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

142.     As sole Director of a closely held New Jersey corporation, to wit: CPI, Souri owed duties of good faith and fair dealing to the officers and shareholders of CPI, including the Mockoviaks. Souri owed duties to the Mockoviaks to ensure that LQD properly perform its obligations under the Loan Agreements and Forbearance Agreement and the assets of CPI were properly administered and/or otherwise utilized.

143.     Specifically, Souri breached his duties by, among other things:



(i)    Failing and/or refusing to ensure that LQD funded its loan to CPI as required under the terms of the Loan Agreements;

(ii)    Contacting CPI's clients, demanding that those clients deposit their payments into LQD's designated lockbox, threatening to charge those clients twice the amount of their account receivables if payment was not immediately remitted to said lockbox, and otherwise threatening to institute litigation against CPI's clients;

(iii)    Sending correspondence to CPI's employees and clients enclosing copies of the Loan Agreements and the Mockoviaks personal information (*i.e.*, residence address, social security numbers, salary, etc.) and demanding that they deal directly with and otherwise remit all future payments directly to LQD, causing CPI's clients to believe that CPI was incapable of maintaining information confidential as required under HIPAA requirements/guidelines and resulting in said clients' refusal to remit outstanding payments to CPI;

(iv)    Changing and/or modifying certain terms and provisions of the Pledge Agreement without the Mockoviaks' knowledge or consent, resulting in Robert Mockoviak's execution of a pledge agreement with significantly different terms than had been previously negotiated with LQD;

(v)    Intentionally interfering with and/or sabotaging Emigrant's proposed capital investment of $9,000,000.00 into CPI; and

(vi)    Exercising dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records and demanding that the Mockoviaks "resign" from their involvement in CPI.

144.    Souri's breaches of his duties of good faith and fair dealing were conscious and deliberate acts that decimated and financially ruined CPI and deprived the Mockoviaks of the benefits to which they were entitled as officers and shareholders of CPI, thereby frustrating and disappointing the reasonable expectations of the Mockoviaks.



145.    As a direct and proximate cause of Souri's breaches of his duties of good faith and fair dealing, the Mockoviaks have suffered substantial direct and consequential damages.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against Souri for the direct and consequential damages in an amount equivalent to the approximate value of CPI, to wit: approximately $22,000,000.00, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### COUNT VII – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### [UNDER ILLINOIS LAW]
### (AGAINST SOURI)

146.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

147.    As sole Director of CPI, Souri owed duties of good faith and fair dealing to the officers and shareholders of CPI, including the Mockoviaks. Souri owed duties to the Mockoviaks to ensure that LQD properly perform its obligations under the Loan Agreements and Forbearance Agreement and the assets of CPI were properly administered and/or otherwise utilized.

148.    Specifically, Souri breached his duties by, among other things:

(i)     Failing and/or refusing to ensure that LQD funded its loan to CPI as required under the terms of the Loan Agreements;

(ii)    Contacting CPI's clients, demanding that those clients deposit their payments into LQD's designated lockbox, threatening to charge those clients twice the amount of their account receivables if payment was not immediately remitted to said lockbox, and otherwise threatening to institute litigation against CPI's clients;

(iii)   Sending correspondence to CPI's employees and clients enclosing copies of the Loan Agreements and the Mockoviaks personal information (*i.e.*, residence address, social security numbers, salary, etc.) and demanding that they deal directly with and otherwise remit all future payments directly to LQD, causing CPI's clients to believe that CPI was incapable of maintaining information confidential as required under HIPAA

34



requirements/guidelines and resulting in said clients' refusal to remit outstanding payments to CPI;

(iv)    Changing and/or modifying certain terms and provisions of the Pledge Agreement without the Mockoviaks' knowledge or consent, resulting in Robert Mockoviak's execution of a pledge agreement with significantly different terms than had been previously negotiated with LQD;

(v)    Intentionally interfering with and/or sabotaging Emigrant's proposed capital investment of $9,000,000.00 into CPI; and

(vi)    Exercising dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records and demanding that the Mockoviaks "resign" from their involvement in CPI.

149.    Souri's breaches of his duties of good faith and fair dealing were conscious and deliberate acts that decimated and financially ruined CPI and deprived the Mockoviaks of the benefits to which they were entitled as officers and shareholders of CPI, thereby frustrating and disappointing the reasonable expectations of the Mockoviaks.

150.    As a direct and proximate cause of Souri's breaches of his duties of good faith and fair dealing, the Mockoviaks have suffered substantial direct and consequential damages.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against Souri for the direct and consequential damages in an amount equivalent to the approximate value of CPI, to wit: approximately $22,000,000.00, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### COUNT VIII – GROSS NEGLIGENCE
### [UNDER NEW JERSEY LAW]
### (AGAINST SOURI)

151.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.



152.     Souri was obligated to perform his duties as sole director of CPI in a manner which created and enhanced an environment of fiscal and managerial stability for the benefit of CPI and its shareholders, including the Mockoviaks.

153.     As sole Director of CPI, Souri was obligated, among other duties, to: (i) properly manage and operate CPI in a manner that would maximize the benefits to CPI and its shareholders; (ii) act honestly, loyally, and in good faith in his management and operation of CPI; and (iii) make prudent, well-informed, and reasonable decisions on behalf of CPI and its shareholders.

154.     Souri breached his respective duties and/or otherwise acted with gross indifference to them by, among other things:

(i)     Failing to ensure CPI's loan with LQD was properly funded in accordance with the terms of the Loan Agreements;

(ii)     Failing and/or refusing to pay CPI's employees their earned wages and salaries until such time as CPI's clients paid their account receivables into an LQD-designated lockbox;

(iii)     Threatening to charge CPI's clients twice the amount of their account receivables if payment was not immediately remitted to an LQD-designated lockbox, and otherwise threatening to institute litigation against CPI's clients;

(iv)     Sending correspondence to CPI's employees and clients enclosing copies of the Loan Agreements and the Mockoviaks personal information (*i.e.*, residence address, social security numbers, salary, etc.) and demanding that they deal directly with and otherwise remit all future payments directly to LQD, causing CPI's clients to believe that CPI was incapable of maintaining information confidential as required under HIPAA requirements/guidelines and resulting in said clients' refusal to remit outstanding payments to CPI;

(v)     Exercising dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and



financial accounts and books and records and demanding that the Mockoviaks "resign" from their involvement in CPI;

(vi)    Intentionally interfering with and/or sabotaging Emigrant's proposed capital investment of $9,000,000.00 into CPI; and

(vii)    Rescinding the Pledge Agreement and Written Consent and purportedly resigning as sole Director of CPI after destroying and/or otherwise running CPI into the ground.

155.    These acts individually constitute and collectively constituted gross negligence and/or willful misconduct.

156.    The Mockoviaks were damaged by Souri's negligent administration and/or operation of CPI and willful, wanton, and purposeful efforts to ensure that CPI and the Mockoviaks would default quickly on the Loan Agreements and he and LQD would own and/or otherwise control CPI and acquire the Mockoviaks' real property, personal property, and assets.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against Souri for the direct and consequential damages in an amount equivalent to the approximate value of CPI, to wit: approximately $22,000,000.00, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### COUNT IX – INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS [UNDER NEW JERSEY LAW] (AGAINST LQD AND AGENT

157.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

158.    LQD had knowledge of CPI's existing contractual agreements with its clients, including, but not limited to, Pfizer, Medtronic, Zona, and Smith and Nephew, and the clients' obligations thereunder, including, but not limited to, their obligations to remit payment on the outstanding account receivables to CPI.



159.    As officers and shareholders of LQD and accommodation parties under the Loan Agreements, the Mockoviaks are intended third-party beneficiaries of CPI's contractual business relationships with its clients.

160.    LQD intentionally interfered with the contractual agreements by inducing the clients to breach their contractual agreements.

161.    LQD's interference with the contractual agreements, particularly its refusal to allow payments to be deposited into CPI's operating account and threats of billing/charging CPI's clients twice the amount of their accounts receivable and/or resorting to litigation, is without justification or privilege. LQD had no prior economic interest in the transaction. The Hard Money Lender merely had a prospective interest in getting CPI's business and making the loan.

162.    CPI has been damaged by LQD's interference with CPI's contractual agreements with its clients. The Hard Money Lender's actions resulted in CPI's clients withholding payment to CPI on its account receivables which constrained and, ultimately, decimated and destroyed CPI. These monies were due to CPI and LQD should have facilitated the monies being paid to CPI.

163.    LQD's interference with the contractual agreements has impaired the Mockoviaks' collateral, namely CPI's collection of its account receivables, resulting in significant harm and damage to the Mockoviaks.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against LQD and Agent for damages and special damages, including, without limitation, all actual losses suffered by the Mockoviaks as a result thereof and all unjust enrichment flowing to LQD and Agent from the Hard Money Lender's interference with CPI's contractual agreements with its clients, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.



### COUNT X – INDEMNIFICATION
### [UNDER NEW JERSEY LAW]
### (AGAINST SOURI)

164.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

165.    From approximately February of 2020 to March of 2020, Souri acted as the Sole Director of CPI.  As its Sole Director, Souri exercised exclusive dominion and control over the business operations and affairs of CPI.

166.    Souri acted as the Sole Director of CPI.  As Sole Director, Souri exercised exclusive dominion and control over the business operations and affairs of CPI.

167.    During his tenure as CPI's self-appointed Sole Director, CPI accumulated various debts.  Specifically, Souri failed and/or otherwise refused to compensate CPI's employees for their earned wages and salaries and pay any of CPI's payroll taxes.  In fact, even after he abandoned the management of CPI, Souri failed to ensure that CPI's operations would continue and/or that its expenses and obligations, including employee payrolls, were being paid.

168.    As a direct result of Souri's failures as Sole Director of CPI, a large number of CPI's former employees have filed lawsuits against CPI and the Mockoviaks for unpaid earned wages and salaries and filed Proofs of Claims in the action.  As such, CPI's former employees are seeking to be compensated exclusively from the assets and proceeds of the Mockoviaks' bankruptcy estate.

169.    The Mockoviaks' alleged liability to CPI's former employees is solely derivative of Souri's failure and/or refusal to compensate them.  The damages claimed by CPI's former employees, if any, were proximately caused and otherwise directly arise from Souri's breach of his fiduciary obligations to CPI and the Mockoviaks.

170.    The Mockoviaks are in no way legally responsible in any manner for the damages allegedly sustained by CPI's former employees.

171.    The relationship between Souri, as Sole Director of CPI, and the Mockoviaks,



as officers and shareholders of CPI, establishes a right of indemnity in the Mockoviaks against Souri in connections with the claims filed by CPI's former employees.

172.    If the Mockoviaks are somehow held liable for all or any part of the claims asserted by CPI's former employees against them, any such liability on the part of results from the acts or omissions of Souri.

173.    Accordingly, Souri should indemnify the Mockoviaks for all amounts for which they may be held liable to CPI's former employees, including any damages, costs, attorneys' fees, or any other sums assessed against the Mockoviaks.

WHEREFORE, the Mockoviaks respectfully request the if judgment is ultimately entered against them for non-payment of CPI's former employees' wages and earnings, judgment be entered in their favor and against Souri in that same amount, together with interest, attorneys' fees and costs, such other and further relief as this Court deems just and proper.

### COUNT XI – CONTRIBUTION
### [UNDER NEW JERSEY LAW]
### (AGAINST SOURI)

174.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

175.    From approximately February of 2020 to March of 2020, Souri acted as the Sole Director of CPI.  As its Sole Director, Souri exercised exclusive dominion and control over the business operations and affairs of CPI.

176.    During his tenure as CPI's self-appointed Sole Director, CPI accumulated various debts.  Specifically, Souri failed and/or otherwise refused to compensate CPI's employees for their earned wages and salaries and pay any of CPI's payroll taxes.  In fact, even after he abandoned the management of CPI, Souri failed to ensure that CPI's operations would continue and/or that its expenses and obligations, including employee payrolls, were being paid.

177.    As a direct result of Souri's failures as Sole Director of CPI, a large number



of CPI's former employees have filed lawsuits against CPI and the Mockoviaks for unpaid wages and earnings and filed Proofs of Claims in the action. As such, CPI's former employees are seeking to be compensated exclusively from the assets and proceeds of the Mockoviaks' bankruptcy estate.

178.    The Mockoviaks demanded that Souri remit payment to CPI's employees, but Souri refused to do so. The Mockoviaks are therefore entitled to contribution from Souri for the wages and earnings that CPI's former employees are seeking to recover from the Mockoviaks.

179.    The Mockoviaks have no immediate, complete and adequate remedy at law.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment: (i) determining the respective rights, duties, and obligations of the Mockoviaks and Souri; (ii) entering judgment against Souri for any amounts recovered from the Mockoviaks in excess of their pro rate share; and (iii) awarding such other and further relief as this Court deems just and proper.

### COUNT XII – EQUITABLE ACCOUNTING
### [UNDER NEW JERSEY LAW]

180.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

181.    This is an action by the Mockoviaks for an equitable accounting of CPI during the period of time that Souri exercised exclusive dominion and control over CPI's business and affairs as its self-appointed Sole Director.

182.    As the Sole Director of CPI, Souri owed CPI and its officers and shareholders, including the Mockoviaks, a fiduciary duty and the Mockoviaks had no choice but to repose their trust and confidence in Souri to properly manage and operate the business affairs of CPI and/or otherwise advance the best interests of CPI. Souri accepted the trust and confidence of the Mockoviaks.

183.    Prior to the commencement of this action, the Mockoviaks demanded that



Souri account for the monies and assets of CPI for the period of time during which he served as its Sole Director.  Despite said requests, Souri failed and/or otherwise refused to provide any information to the Mockoviaks.

184.    As officers and shareholders of CPI, the Mockoviaks are entitled to an accounting of all of the funds received and disbursed by CPI during the period of time that Souri served as its Sole Director in order to determine the extent of the harm to collateral and/or dissipation in value that Souri's actions inflicted on CPI.

185.    The Mockoviaks have no adequate remedy at law and are therefore entitled to an accounting so that the collateral and assets misappropriated and/or otherwise dissipated by Souri can be properly traced and delivered to CPI and, ultimately, to its shareholders and/or their creditors.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment: (i) requiring an accounting of the assets and monies of CPI; (ii) entering a judgment against Souri for any sums found to be due to the Mockoviaks and/or CPI  in order to be properly distributed to Mockoviaks and/or their creditors; and (iii) awarding such other and further relief as this Court deems just and proper.

### COUNT XIII – LENDER LIABILITY
### [UNDER ILLINOIS LAW]
### (AGAINST LQD AND AGENT)

186.    CPI's business and financial affairs were conducted under the control and direction of LQD and its principal, Souri.

187.    By virtue of its implementation of the Pledge Agreement and Souri's self-appointment as sole Director of CPI, LQD assumed actual, participatory, complete control and domination over the stock, finances, and business affairs and operations of CPI.

188.    Through their exercise of improper control over the business affairs and operations of CPI, LQD and Souri created a fiduciary relationship between LQD and Agent - on one hand - and CPI and the Mockoviaks - on the other hand.

189.    At that time, despite their ongoing interests as officers and shareholders of



CPI, LQD and Souri precluded the Mockoviaks from participating and/or otherwise having any say in the business affairs and operations of CPI, including the administration and/or performance of and its compliance with the Loan Agreement. As such, CPI did not have its own separate mind, will, and/or existence and was otherwise being used exclusively to further the purposes and interests of LQD and Souri.

190.    LQD and Souri utilized their control over CPI in violation of the duties owed to CPI and the Mockoviaks and otherwise dishonestly and unjustly acted in contravention of CPI and the Mockoviaks' legal rights. Specifically, LQD and Souri breached their duties by, among other things:

(i)    Without any notice to and/or permission from CPI, directly contacting CPI's clients, demanding that those clients deposit their payments into LQD's designated lockbox, threatening to charge those clients twice the amount of their account receivables if payment was not immediately remitted to said lockbox, and otherwise threatening to institute litigation against CPI's clients;

(ii)    Refusing to properly fund the Loan Agreements and otherwise precluded the Mockoviaks and CPI from paying CPI's employees their earned wages and salaries and/or disbursing any funds until such time as CPI's clients deposited their account receivable payments into LQD's designated lockbox;

(iii)    Sending correspondence to CPI's employees and clients enclosing copies of the Loan Agreements and the Mockoviaks personal information (*i.e.*, residence address, social security numbers, salary, etc.) and demanding that they deal directly with and otherwise remit all future payments directly to LQD, causing CPI's clients to believe that CPI was incapable of maintaining information confidential as required under HIPAA requirements/guidelines and resulting in said clients' refusal to remit outstanding payments to CPI;

(iv)    Declaring the Loan Agreements to be in default and accelerating the balance due thereunder for "technical" breaches



(v)     Changing and/or modifying certain terms and provisions of the Pledge Agreement without the Mockoviaks' knowledge or consent, resulting in Robert Mockoviak's execution of a pledge agreement with significantly different terms than had been previously negotiated with LQD;

(vi)    Exercising dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records and demanding that the Mockoviaks "resign" from their involvement in CPI; and

(vii)   Rescinding the Pledge Agreement and relinquishing control and management over CPI to the Mockoviaks after destroying and/or otherwise running CPI into the ground.

191.    LQD and Souri's absolute dominion and control over the business affairs and operation of CPI and breach of the duties owed to CPI and the Mockoviaks have caused the Mockoviaks and/or their creditors to suffer significant damages.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against LQD and Agent for direct and consequential damages in an amount equivalent to the approximate value of CPI, to wit: approximately $22,000,000.00, plus interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### COUNT XIV – NEGLIGENT IMPAIRMENT OF COLLATERAL
### [UNDER ILLINOIS LAW]
### (AGAINST LQD AND AGENT)

192.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

193.    On August 23, 2019, CPI entered into the Loan Agreements with LQD.

194.    As part of the loan transaction, CPI pledge to LQD as security for LQD's loans a wide variety of assets, including, but not limited to, CPI's account receivables.

195.    In addition, as part of the loan transaction, LQD required that the Mockoviaks execute the Loan Agreements as accommodation parties. At no time did the

44



Mockoviaks receive any direct benefit or anything of value in exchange for their execution of the Loan Agreements.

196.    LQD had dominion and control of CPI's assets, including the collection of any and all outstanding amounts due and owing to CPI from its clients.

197.    LQD had an obligation to use reasonable care in the preservation of CPI's collateral.

198.    LQD failed to exercise reasonable care and instead acted in a grossly negligent and reckless manner.

199.    By, among other things: (i) refusing to provide CPI with the funding in accordance with the terms of the Loan Agreements; (ii) threatening to charge CPI's clients twice the amount of their account receivables and/or institute litigation against them if payment was not immediately remitted to LQD's designated lockbox; and (iii) providing confidential and misleading information about CPI and the Mockoviaks to CPI's clients, LQD created a liquidity crisis that severely impaired CPI's collateral.  In fact, as a direct result of LQD and Souri's actions, CPI's clients, including, but not limited to its two largest clients, Pfizer and Opko, refused to remit payment of any outstanding account receivables owed to CPI and terminated their respective business relationships with CPI.

200.    LQD knew or recklessly disregarded the risk that their communications with and demands made upon CPI's clients would impact payment of CPI's account receivables and impair the value of CPI's collateral.

201.    CPI has suffered significant impairment to the value of its collateral proximately caused by LQD's gross negligence and recklessness.

202.    LQD's actions in connection with the Loan Agreements have discharged the Mockoviaks, as accommodation parties, from liability for any purported amounts that remain due and owing to LQD under the Loan Agreements.

WHEREFORE, the Mockoviaks respectfully request the entry of a judgment in their favor and against LQD and Agent:



(i)      Determining that LQD and Souri negligently and/or recklessly impaired the collateral of CPI, causing significant harm and/or to CPI and its shareholders, including the Mockoviaks;

(ii)     Deeming that LQD's exercise of dominion and control over the management and operation of CPI and CPI's assets and account receivables constituted a discharge of the Mockoviaks, as accommodation parties, from liability for any purported amounts that remain due and owing to LQD under the Loan Agreements; and

(iii)    Granting such other and further relief as the Court deems just and equitable.

### COUNT XV – AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 547 AND 550 (AGAINST LQD AND AGENT)

203.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

204.    This is an action by the Mockoviaks against LQD and Agent to avoid and recover preferential transfers made to or for their benefit pursuant to 11 U.S.C. §§ 547 and 550 of the Bankruptcy Code.

205.    During the ninety (90) days prior to the Petition Date, LQD and Agent received one or more transfers, including, but not necessarily limited to: (i) Florida UCC; (ii) Pennsylvania UCC; (iii) Forbearance Agreement; (iv) Amendment; (v) Pledge Agreement; and (vi) Judgment by Confession (collectively, the "**90 Day Transfers**"), on account of an antecedent debt.

206.    The 90 Day Transfers at issue may be avoided by the Mockoviaks because they constituted transfers of the Mockoviaks' interest in real property, personal property, and assets.

207.    The 90 Day Transfers were made:

(i)      To or for the benefit of LQD and Agent, who, at all relevant times, were creditors of the Mockoviaks who made the particular 90 Day Transfers;



(ii)     For or on account of an antecedent debt purportedly owed by the Mockoviaks to LQD and Agent before such 90 Day Transfers were made;

(iii)    While the Mockoviaks were insolvent; and

(iv)    On or within 90 days of the Petition Date.

208.    The 90 Day Transfers to LQD and Agent enabled them to receive more than they would have received if:

(i)     This case was a case under Chapter 11 of the Bankruptcy Code;

(ii)    The 90 Day Transfers had not been made; and

(iii)   LQD and Agent received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

209.    By reason of the foregoing, the 90 Day Transfers are avoidable by the Mockoviaks pursuant to 11 U.S.C. § 547 of the Bankruptcy Code.

210.    The Mockoviaks are entitled to recover the amount or value of the 90 Day Transfers from LQD and Agent pursuant to 11 U.S.C. § 550 of the Bankruptcy Code.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment against LQD and Agent:

(i)     Avoiding the 90 Day Transfers to LQD and Agent pursuant to 11 U.S.C. § 547 of the Bankruptcy Code;

(ii)    Awarding a money judgment in favor of the Mockoviaks and against LQD and Agent in an amount no less than the 90 Day Transfers pursuant to 11 U.S.C. § 550 of the Bankruptcy Code, plus prejudgment interest;

(iii)   Disallowing any claim that LQD and Agent may have against the Mockoviaks' bankruptcy estates until such time as LQD and Agent pay the 90 Day Transfers asserted herein as provided in to 11 U.S.C. § 502 of the Bankruptcy Code;

(iv)    Awarding costs and expenses of this action, including, without limitation,



attorneys' fees; and

(v)    Granting such other and further relief as the Court deems just and equitable.

### COUNT XVI – AVOIDANCE OF TRANSFERS PURSUANT TO 11 U.S.C. § 544 AND N.J.S.A. 25:2-20-25:2-34 (AGAINST LQD AND AGENT)

211.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

212.    Pursuant to Section 544 of the Bankruptcy Code, a trustee or debtor in possession may avoid, inter alia, any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Section 502 of the Bankruptcy Code.

213.    LQD asserts a senior security interest and lien in the Mockoviaks' assets and property.

214.    However, LQD failed to properly perfect any security interest or lien in the Mockoviaks prior to the Petition Date.

215.    Under the laws of State of New Jersey, specifically New Jersey Statutes 25:2-20-25:2-34, the security agreement and hence the above-described seizure would be voidable by a creditor that, on the date on which the petition was filed, extended credit to the debtors and obtained with respect to such credit a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien.

216.    Therefore, LQD's asserted  security interests and liens are voidable by the Mockoviaks.

WHEREFORE, the Mockoviaks respectfully request the entry of judgment voiding LQD's security interests and liens, along with such other and further relief as the Court deems just and equitable.



## COUNT XVII – EQUITABLE SUBORDINATION OF LQD'S CLAIMS PURSUANT TO 11 U.S.C. § 510(C)
### (AGAINST LQD AND AGENT)

217.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

218.    LQD and Agent's claims in this case arise wholly from LQD's inequitable conduct as described herein and should be subordinated to the claims of other creditors and equity holders of the Mockoviaks.

219.    Moreover, LQD's conduct caused injury to the Mockoviaks' other creditors and conferred an unfair advantage on LQD and Agent.

220.    Under principles of equitable subordination, all claims asserted against the Mockoviaks by, on behalf of or for the benefit of LQD and Agent should be subordinated for purposes of distribution pursuant to 11 U.S.C. §§ 501(c) and 105(a) of the Bankruptcy Code.

221.    During its negotiations with CPI and the Mockoviaks over the Loan Agreements, LQD fraudulently misrepresented that its desire in entering into the Loan Agreements was to provide financing for CPI so that CPI could successfully operate its business, meet the needs of its clients, and compensate its employees. The Hard Money Lender presented misleading information that caused the Mockoviaks and CPI to believe that LQD's financing plan would allow the Mockoviaks to operate CPI and continue its growth.

222.    These representations were false and known by LQD to be false when made, as LQD and Agent intended at all times to induce the Mockoviaks and CPI into entering into the Loan Agreements, then act in bad faith so that they could declare CPI and the Mockoviaks to be in default, accelerate the loan balance, take over the management and operation of CPI for its own benefit, and pursue collection of the Mockoviaks' real property, personal property, and assets. All the while, LQD continually assured the Mockoviaks that its intention was for CPI to succeed in operating its business when in fact, the opposite was true.



223.    In fact, in direct contravention and contumacious disregard of its representations and statements, LQD:

(i)    Without any notice to and/or permission from CPI, directly contacted CPI's clients, demanded that those clients deposit their payments into LQD's designated lockbox, threatened to charge those clients twice the amount of their account receivables if payment was not immediately remitted to said lockbox, and otherwise threatened to institute litigation against CPI's clients;

(ii)    Refused to properly fund the Loan Agreements and otherwise precluded the Mockoviaks and CPI from paying CPI's employees their earned wages and salaries and/or disbursing any funds until such time as CPI's clients deposited their account receivable payments into LQD's designated lockbox;

(iii)    Sent correspondence to CPI's employees and clients enclosing copies of the Loan Agreements and the Mockoviaks personal information (*i.e.*, residence address, social security numbers, salary, etc.) and demanding that they deal directly with and otherwise remit all future payments directly to LQD, causing CPI's clients to believe that CPI was incapable of maintaining information confidential as required under HIPAA requirements/guidelines and resulting in said clients' refusal to remit outstanding payments to CPI;

(iv)    Failed to cover CPI's payroll and/or otherwise pay CPI's employees their salaries and/or earned wages;

(v)    Changed and/or modified certain terms and provisions of the Pledge Agreement without the Mockoviaks' knowledge or consent, resulting in Robert Mockoviak's execution of a pledge agreement with significantly different terms than had been previously negotiated with LQD;

(vi)    Exercised dominion and control over the management and operation of CPI, including maintaining exclusive control over CPI's assets and control over CPI's offices and financial accounts and books and records and demanding that the Mockoviaks "resign" from



their involvement in CPI; and

(vii)    Rescinded the Pledge Agreement and relinquished control and management over CPI to the Mockoviaks after destroying and/or otherwise running CPI into the ground.

224.    At all times, the Hard Money Lender knew its intentions were inequitable and conduct was fraudulent yet induced the Mockoviaks and CPI to enter into the Loan Agreements under the guise that it wanted CPI to succeed when at all times, LQD planned for CPI to fail so that it could seize control over CPI and acquire the real property, personal property, and assets of the Mockoviaks. The Mockoviaks detrimentally and justifiably relied on these fraudulent misrepresentations in deciding to enter into the Loan Agreements.

225.    As a direct and proximate result of LQD's fraudulent and inequitable conduct, the Mockoviaks have suffered severe damages, including: (i) the destruction of CPI, loss of existing clients and prospective client contracts, and loss of their sole source of income; (ii) the loss of real property, personal property, and assets resulting from the entry of a Judgment by Confession in the Lawsuit and subsequent levy/execution proceedings commenced against the Mockoviaks; and (iii) claims and lawsuits being instituted against the Mockoviaks arising from LQD's failure and/or refusal to compensate CPI's employees and furnish CPI's clients with the clinical services required under their respective agreements.

226.    The Hard Money Lender's conduct as set forth above was undertaken with no regard to the impact that such conduct would have on other creditors of the Mockoviaks. LQD's inequitable actions have injured other creditors because funds that would have been derived from the purchase and/or sale of the Mockoviaks' personal property and assets and paid to those creditors were diverted to LQD and Agent in connection with the Loan Agreements. Those creditors did nothing to contribute to the risk of non-payment or the onerous terms of the Loan Agreements, Forbearance Agreement, Amendment, and Stock Pledge Agreement, and should not be punished by LQD's misconduct.

227.    Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.



WHEREFORE, the Mockoviaks respectfully request that:

(i)      Judgment be entered against LQD and Agent ordering that their claims against the Mockoviaks be equitably subordinated to the claims of other creditors or denied due to LQD's inequitable conduct and bad faith in negotiating, administering and pursuing collection of the Loan Agreements against the Mockoviaks;

(ii)     Requiring the transfer and/or return of any personal property or assets of the Mockoviaks received by LQD and Agent on account of the Loan Agreements;

(iii)    Requiring the disgorgement of all payments and consideration received by LQD and Agent on account of the Loan Agreements; and

(iv)     Granting such other and further relief as the Court deems just and equitable.

### COUNT XVIII – DECLARATORY JUDGMENT
### (AGAINST LQD AND AGENT)

228.    The Mockoviaks readopt and reallege paragraphs 1-114 of this Amended Adversary Complaint as if set forth fully herein.

229.    This is an action for declaratory judgment and relief against LQD and Agent under Rule 57 of the Federal Rules of Civil Procedure.  Pursuant to 28 U.S.C. § 2201(a), this Court has jurisdiction to declare the rights and other legal relations being sought by the Mockoviaks.

230.    The Mockoviaks bring this cause of action against LQD and Agent seeking a declaration that: (i) at the time of LQD's wrongful takeover of the management and operation of CPI, CPI had sufficient collateral and account receivables to pay back the Loan Agreements; and (ii) LQD's exercise of dominion and control over the management and operation of CPI and CPI's assets and account receivables constituted an acceptance of the collateral in full and final satisfaction of the Mockoviaks and CPI's obligations under the Loan Agreement and/or the Mockoviaks are entitled to a credit for the full amount of CPI's collateral and account receivables against any amounts claimed by LQD and Agent against the Mockoviaks.



231.    At the time that CPI and the Mockoviaks [in their capacities as accommodation parties] entered into the Loan Agreements with LQD, CPI had an estimated cash basis valuation of approximately $27,000,000.00.

232.    In addition, as evident from the Waterfall prepared by McGaugh in December 2019, CPI had secured contractual agreements with new clients, including, but not limited to, Bayer, Reflexion and Canopy, that were scheduled to begin in 2020 and promised to bring total projected revenues to CPI of: (i) $10,576,000.00 for the year 2019; (ii) $20,385,148 for the year 2020; (iii) $27,407,795 for the year 2021; and (iv) $24,847,424 for the year 2022. As such, CPI had more than sufficient collateral and account receivables to pay back the amounts received under the Loan Agreements and Amendment.

233.    As a direct and proximate result of LQD and Souri's exercise of dominion and control over the management and operation of CPI and other fraudulent and inequitable conduct perpetrated  by LQD and its CEO, Souri [as more fully delineated above], CPI's clients lost confidence in CPI resulting in: (i) CPI's clients refusal to remit payment of account receivables to CPI; (ii) termination of CPI's existing business relationships with its clients; and (iii) CPI's inability to perform under and loss of the new contractual agreements for 2020.

234.    LQD and Souri's exercise of dominion and control over the management and operation of CPI and CPI's assets, account receivables, etc., constituted an acceptance of the collateral in full and final satisfaction of the Mockoviaks and CPI's obligations under the Loan Agreement.  As a result of LQD and Souri's failure to use reasonable care in the custody and preservation of the collateral, the loan collateral suffered a significant diminution in value and CPI was destroyed.

235.    Given that the Hard Money Lender's actions resulted in a significant diminution in value of the loan collateral, loss of revenue to CPI and, ultimately, the destruction of CPI [causing the Mockoviaks significant losses as officers, employees, and shareholders of CPI], the Mockoviaks are entitled to a credit for the full amount of CPI's collateral and account receivables as against any amounts claimed by LQD and Agent against



the Mockoviaks.

236. As officers and shareholders of CPI, the Mockoviaks have a real, tangible, and protectible interest in the assets and account receivables of CPI, especially since LQD and Agent are seeking to hold them liable for the entire outstanding amounts purportedly due and owing to them under the Loan Agreements.

237. The judicial declaration sought by the Mockoviaks concerns a controversy as to a present, ascertained or ascertainable state of facts. Furthermore, LQD and Agent have an actual, present, adverse, and antagonistic interest in the subject matter of the declaratory relief sought by the Mockoviaks.

238. As a consequence of LQD and Agent's actions and claims, the Mockoviaks are in doubt as to the existence or non-existence of their right to have LQD's exercise of dominion and control over the management and operation of CPI and CPI's assets, account receivables, etc., deemed an acceptance of the collateral in full and final satisfaction of the Mockoviaks and CPI's obligations under the Loan Agreement and/or their right to a credit for the full amount of CPI's collateral and account receivables as against any amounts claimed by LQD and Agent against the Mockoviaks.

239. Pursuant to Rule 57 of the Federal Rules of Civil Procedure, the Mockoviaks are entitled to have such doubt removed.

WHEREFORE, the Mockoviaks respectfully request the entry of a declaratory judgment in their favor and against LQD and Agent:

(i) Determining that, at the time of LQD's wrongful takeover of the management and operation of CPI, CPI had sufficient collateral and account receivables to pay back the Loan Agreements;

(ii) Deeming that LQD's exercise of dominion and control over the management and operation of CPI and CPI's assets and account receivables constituted an acceptance of the collateral in full and final satisfaction of the Mockoviaks and CPI's obligations under the Loan Agreement and/or otherwise providing the Mockoviaks with a credit for the full



amount of CPI's collateral and account receivables against any amounts claimed by LQD and Agent against the Mockoviaks; and

(iii)    Granting such other and further relief as the Court deems just and equitable.

Dated: July 24, 2020                    Respectfully submitted,

**SALAZAR LAW**
*Counsel for Debtors, Robert J. Mockoviak*
*and Sandra H. Mockoviak*
2000 Ponce de Leon Boulevard, Penthouse
Coral Gables, Florida  33134
Telephone: (305) 374-4848
Facsimile:  (305) 397-1021
Primary Email:  Luis@Salazar.Law
Primary Email:  Ceide@Salazar.Law
Secondary Email:  Lee-Sin@Salazar.Law
Secondary Email:  eService@Salazar.Law


By:    /s/    Luis Salazar
          Luis Salazar
          Florida Bar No. 147788
          Jose Ceide
          Florida Bar No. 015937

55



## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/  Luis Salazar
Luis Salazar

**SALAZAR LAW**

## SERVICE LIST

**ELECTRONIC MAIL NOTICE:**

- **Andrew Fulton IV**    andrew@kelleylawoffice.com,
  tina@kelleylawoffice.com;cassandra@kelleylawoffice.com;kristina@kelleylawoffice.com;debbie@kelleylawoffice.com;dana@kelleylawoffice.com
- **Luis Salazar**    Luis@Salazar.Law, Ceide@salazar.law;Lee-Sin@Salazar.Law;Rivera@Salazar.Law

SALAZAR LAW